DIANA GRIBBON MOTZ, Circuit Judge,
concurring in the judgment:
For over two centuries of growth and struggle, peace and war, the Constitution has secured our freedom through the guarantee that, in the United States, no one will be deprived of liberty without due process of law. Yet more than five years ago, military authorities seized Ali Saleh Kahlah al-Marri, an alien lawfully residing here. He has been held by the military ever since — without criminal charge or process. He has been so held, despite the fact that he was initially taken from his home in Peoria, Illinois, by civilian authorities and imprisoned awaiting trial for purported domestic crimes. He has been so held, although the Government has never alleged that he is a member of any nation’s military, has fought alongside any nation’s armed forces, or has borne arms against the United States anywhere in the world. And he has been so held, without acknowledgment of the protection afforded by the Constitution, solely because the Executive believes that his indefinite military detention — or even the indefinite military detention of a similarly situated American citizen — is proper.
While criminal proceedings were underway against al-Marri, the President ordered the military to seize and detain him indefinitely as an enemy combatant. Since that order, issued in June of 2003, al-Marri has been imprisoned without charge in a military jail in South Carolina. Al-Marri petitions for a writ of habeas corpus to secure his release from military imprisonment. The Government defends this detention, asserting that al-Marri associated with al Qaeda and “prepar[ed] for acts of international terrorism.” It maintains that the President has both statutory and inherent constitutional authority to subject to indefinite military detention al-Marri or anyone else who associates with al Qaeda and “prepare[s]” for such acts. If the Government accurately describes al-Mar-ri’s conduct, he has committed grave crimes, but a majority of the en banc court holds, as the panel did, that the judgment of the district court must be reversed.[1]
We would also grant al-Marri habeas relief. Even assuming the truth of the Government’s allegations, they provide no basis for treating al-Marri as an enemy combatant or as anything other than a civilian. This does not mean that al-Marri, or similarly situated American citizens, would have to be freed. Like others accused of terrorist activity in this country, from the Oklahoma City bombers to the convicted September 11th conspirator, they could be tried on criminal charges and, if convicted, punished severely. But the Government would not be able to subject them to indefinite military detention.
With regret, we recognize that this view does not command a majority of the court. Our colleagues hold that the President can order the military to seize from his home *218 and indefinitely detain anyone in this country — including an American citizen — even though he has never affiliated with an enemy nation, fought alongside any nation’s armed forces, or borne arms against the United States anywhere in the world. We cannot agree that in a broad and general statute, Congress silently authorized a detention power that so vastly exceeds all traditional bounds. No existing law permits this extraordinary exercise of executive power.[2] Even in times of national peril, we must follow the law, lest this country cease to be a nation of laws. For “[liberty and security can be reconciled; and in our system they are reconciled within the framework of the law.” Boumediene v. Bush, —U.S. -, 128 S.Ct. 2229, 2278, 171 L.Ed.2d 41 (2008).
Although our preferred disposition does not command a majority of the court, a majority does refuse to affirm the judgment of the district court. To give effect to the conclusion of that majority, we join in “ordering remand on terms closest to those” we would prefer. See Hamdi v. Rumsfeld, 542 U.S. 507, 553, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (Souter, J., concurring in part, dissenting in part, and concurring in the judgment); see also Screws v. United States, 325 U.S. 91, 134, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (Rutledge, J., concurring in the result). In this case, that means that we join in a judgment reversing and remanding for eviden-tiary proceedings to determine whether al-Marri actually is an enemy combatant and so subject to military detention. Although we believe that Congress in the Authorization for Use of Military Force (AUMF), 115 Stat. 224, note following 50 U.S.C.A. § 1541 (West 2003), has not authorized al-Marri’s military detention, the evidentiary proceedings envisioned by Judge Traxler will at least place the burden on the Government to make an initial showing that “the normal due process protections available to all within this country” are impractical or unduly burdensome in al-Marri’s case and that the hearsay declaration that constitutes the Government’s only evidence against al-Marri is “the most reliable available evidence” supporting the Government’s allegations. Post at 273-74.
In reaching our conclusions, we note at the outset that we respect our dissenting colleagues’ strongly held contrary views— and the rhetoric with which they advance those views. But rhetoric and passion— no matter how sincere — cannot substitute for faithful application of the Constitution and controlling legal principles. In this respect, the dissents fail. Finding scant legal support for their positions, our hardworking dissenting colleagues resort to inventing new definitions of enemy combatant. Not only have none of their differing definitions been adopted by Congress or advocated by the Government, these definitions are contrary to law-of-war principles long followed by the Supreme Court. The absence of authority supporting any of these divergent positions unsurprisingly results in our colleagues’ inability to agree on the scope of the Executive’s power to detain or the correct process for reviewing such detentions. Thus, while we do not doubt the dissenters’ good faith and good will, we must reject their approaches.
*219 As the Supreme Court recently reminded us, “[sjecurity subsists ... in fidelity to freedom’s first principles. Chief among these are freedom from arbitrary and unlawful restraint and the personal liberty that is secured by adherence to the separation of powers.” Boumediene, 128 S.Ct. at 2277. To allow the President, in the absence of congressional authorization, to exercise military force against civilians in this country is to abandon these principles. Without them, neither freedom nor security can survive.
I.
Al-Marri, a citizen of Qatar, lawfully entered the United States with his wife and children on September 10, 2001, to pursue a master’s degree at Bradley University in Peoria, Illinois, where he had obtained a bachelor’s degree in 1991. The following day, terrorists hijacked four commercial airliners and used them to kill and inflict grievous injury on thousands of Americans. Three months later, on December 12, 2001, FBI agents arrested al-Marri at his home in Peoria as a material witness in the Government’s investigation of the September 11th attacks. Al-Marri was imprisoned in civilian jails in Peoria and then New York City.
In February 2002, al-Marri was charged in the Southern District of New York with the possession of unauthorized or counterfeit credit card numbers with the intent to defraud. A year later, in January 2003, he was charged in a second, six-count indictment with two counts of making a false statement to the FBI, three counts of making a false statement on a bank application, and one count of using another person’s identification for the purpose of influencing the action of a federally insured financial institution. Al-Marri pleaded not guilty to all of these charges. In May 2003, a federal district court in New York dismissed the charges against al-Marri for lack of venue.
The Government then returned al-Marri to Peoria, and he was re-indicted in the Central District of Illinois on the same seven counts, to which he again pleaded not guilty. The district court set a July 21, 2003, trial date. On Friday, June 20, 2003, the court scheduled a hearing on pretrial motions, including a motion to suppress evidence against al-Marri assertedly obtained by torture. On the following Monday, June 23, before that hearing could be held, the Government moved ex parte to dismiss the indictment based on an order signed that morning by the President.
In the order, President George W. Bush stated that he “DETE RMINE [D] for the United States of America that” al-Marri: (1) is an enemy combatant; (2) is closely associated with al Qaeda; (3) “engaged in conduct that constituted hostile and warlike acts, including conduct in preparation for acts of international terrorism”; (4) “possesses intelligence ... that ... would aid U.S. efforts to prevent attacks by al Qaeda”; and (5) “represents a continuing, present, and grave danger to the national security of the United States.” The President determined that al-Marri’s detention by the military was “necessary to prevent him from aiding al Qaeda” and thus ordered the Attorney General to surrender al-Marri to the Secretary of Defense and further directed the Secretary of Defense to “detain him as an enemy combatant.”
The federal district court in Illinois granted the Government’s motion to dismiss the criminal indictment against al-Marri. In accordance with the President’s order, al-Marri was then transferred to military custody and brought to the Naval Consolidated Brig in South Carolina.
*220 Since that time (that is, for five years) the military has held al-Marri as an enemy combatant, without charge and without any indication when this confinement will end. For the first sixteen months of his military confinement, the Government did not permit al-Marri any communication with the outside world, including his attorneys, his wife, and his children. He alleges that he was denied basic necessities, interrogated through measures creating extreme sensory deprivation, and threatened with violence. A pending civil action challenges the “inhuman, degrading,” and “abusive” conditions of his confinement. See Complaint at 1, Al-Marri v. Rumsfeld, No. 2:05-cv-02259-HFFRSC (D.S.C. Aug. 8, 2005).
On July 8, 2003, counsel for al-Marri petitioned on his behalf (because it was undisputed that he was unavailable to petition) for a writ of habeas corpus in the Central District of Illinois. The district court dismissed the petition for lack of venue, Al-Marri v. Bush, 274 F.Supp.2d 1003 (C.D.Ill.2003); the Seventh Circuit affirmed, Al-Marri v. Rumsfeld, 360 F.3d 707 (7th Cir.2004); and the Supreme Court denied certiorari, al-Marri v. Rumsfeld, 543 U.S. 809, 125 S.Ct. 34, 160 L.Ed.2d 11 (2004). On July 8, 2004, al-Marri’s counsel filed the present habeas petition on al-Marri’s behalf in the District of South Carolina. On September 9, 2004, the Government answered al-Marri’s petition, citing the Declaration of Jeffrey N. Rapp, Director of the Joint Intelligence Task Force for Combating Terrorism, as support for the President’s order to detain al-Marri as an enemy combatant.
The Rapp Declaration asserts that al-Marri: (1) is “closely associated -with al Qaeda, an international terrorist organization with which the United States is at war”; (2) trained at an al Qaeda terrorist training camp in Afghanistan sometime between 1996 and 1998; (3) in the summer of 2001, was introduced to Osama Bin Laden by Khalid Shaykh Muhammed; (4) at that time, volunteered for a “martyr mission” on behalf of al Qaeda; (5) was ordered to enter the United States sometime before September 11, 2001, to serve as a “sleeper agent” to facilitate terrorist activities and explore disrupting this country’s financial system through computer hacking; (6) in the summer of 2001, met with terrorist financier Mustafa Ahmed al-Hawsawi, who gave al-Marri money, including funds to buy a laptop; (7) gathered technical information about poisonous chemicals on his laptop; (8) undertook efforts to obtain false identification, credit cards, and banking information, including stolen credit card numbers; (9) communicated with known terrorists, including Khalid Shaykh Muhammed and al-Hawsawi, by phone and e-mail; and (10) saved information about jihad, the September 11th attacks, and Bin Laden on his laptop computer.
The Rapp Declaration does not assert that al-Marri: (1) is a citizen, or affiliate of' the armed forces, of any nation at war with the United States; (2) was seized on, near, or having escaped from a battlefield on which the armed forces of the United States or its allies were engaged in combat; (3) was ever in Afghanistan during the armed conflict between the United States and the Taliban there; or (4) directly participated in any hostilities against United States or allied armed forces.
On October 14, 2004, the Government permitted al-Marri access to his counsel for the first time since his initial confinement as an enemy combatant sixteen months before. (According to al-Marri’s counsel, as of the time of the en bane filings, the Government still has not permitted al-Marri to speak to his wife or any of his five children.) Al-Marri then submitted a reply to the Government’s evi *221 dence, contending that he is not an enemy combatant; he then moved for summary judgment. The district court denied the summary judgment motion and referred the case to a magistrate judge for consideration of the appropriate process to be afforded al-Marri in light of Hamdi, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578. The magistrate judge ruled that the Rapp Declaration provided al-Marri with sufficient notice of the basis of his detention as an enemy combatant and directed al-Marri to file rebuttal evidence.
In response to the magistrate’s ruling, al-Marri again denied the Government’s allegations but filed no rebuttal evidence, contending that the Government had an initial burden to produce evidence that he was an enemy combatant and that the Rapp Declaration did not suffice. The magistrate judge recommended dismissal of al-Marri’s habeas petition because al-Marri had failed to rebut the allegations in the Rapp Declaration. In August 2006, the district court adopted the magistrate judge’s report and recommendation and dismissed al-Marri’s habeas petition. A few days later, al-Marri noted this appeal.[3]
After oral argument, a panel of this court reversed the judgment of the district court and remanded the case for further proceedings. See Al-Marri, 487 F.3d 160. On the Government’s motion for rehearing, the court voted to vacate the panel opinion and hear the case en banc. For the reasons set forth within, we would once again hold that al-Marri must be afforded habeas relief and so would reverse the judgment of the district court and remand the case for further proceedings consistent with that holding.
II.
Al-Marri premises his habeas claim on the Fifth Amendment’s guarantee that no person living in this country can be deprived of liberty without due process of law. He maintains that even if he has committed the acts the Government alleges, he is not a combatant but a civilian protected by our Constitution, and thus is not subject to military detention. Al-Mar-ri acknowledges that the Government can deport him or charge him with a crime and, if he is convicted in a civilian court, imprison him. But he insists that neither the Constitution nor any law permits the Government, on the basis of the evidence it has proffered to date — even assuming all of that evidence is true — to treat him as an enemy combatant and subject him to indefinite military detention, without criminal charge or process.
The Government contends that the district court properly denied habeas relief to al-Marri, because the Constitution allows detention of enemy combatants by the military without criminal process, and, according to the Government, it has proffered evidence that al-Marri is an enemy combatant. The Government argues that the AUMF, as construed by precedent and considered in conjunction with the “legal background against which [it] was enacted,” empowers the President on the basis of that proffered evidence to order al-Marri’s indefinite military detention as an enemy combatant. Alternatively, the Government contends that even if the AUMF does not authorize the President to order al-Marri’s military detention, the President has “inherent constitutional power” to do so.
*222 A.
Each party grounds its case on well-established legal doctrine. Moreover, important principles guiding our analysis seem undisputed. Before addressing the conflicting contentions of the parties, we note these fundamental principles, which we take to be common ground.
The Constitution guarantees that no “person” shall “be deprived of life, liberty, or property, without due process of law.” U.S. Const., amend. V; see also id. amend. XIV, § 1. The text of the Fifth Amendment affords this guarantee to “person[s],” not merely citizens, and so the constitutional right to freedom from deprivation of liberty without due process of law extends to all lawfully admitted aliens living within the United States. See Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896); see also United States v. Verdugo-Urquidez, 494 U.S. 259, 271, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).
To be sure, as al-Marri’s counsel conceded at oral argument before the en bane court, our Constitution has no “force in foreign territory unless in respect of our citizens.” United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936). But, as Chief Justice Rehnquist explained, a long line of Supreme Court cases establishes that aliens receive certain protections — including those rights guaranteed by the Due Process Clause — “when they have come within the territory of the United States and developed substantial connections with this country.” Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056; see also Boumediene, 128 S.Ct. at 2246 (noting that “the Constitution’s ... substantive guarantees of the Fifth and Fourteenth Amendments ... protect! ] persons,” including “foreign nationals”); Sanchez-Llamas v. Oregon, 548 U.S. 331, 126 S.Ct. 2669, 2681-82, 165 L.Ed.2d 557 (2006) (observing that “[a] foreign national ... like anyone else in our country enjoys under our system the protections of the Due Process Clause”); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (noting that “once an alien lawfully enters and resides in this country he becomes invested with ... rights ... protected by ... the Fifth Amendment! ] and by the due process clause of the Fourteenth Amendment” (internal quotation marks omitted)); Wong Wing, 163 U.S. at 238, 16 S.Ct. 977 (holding that “all persons within the territory of the United States are entitled to the protection guaranteed by” the Due Process Clause of the Fifth Amendment); Yick Wo v. Hopkins, 118 U.S. 356, 369, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) (explaining that the Due Process Clause of the Fourteenth Amendment protects “all persons within the territorial jurisdiction” of the United States). Thus, the Due Process Clause protects not only citizens but also aliens, like al-Marri, lawfully admitted to this country who have established substantial connections here — in al-Marri’s case by residing in Illinois for several months with his family and attending university there.[4]
“Freedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects.” Zadvydas v. Davis, 533 U.S. 678, 690, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); see also Foucha v. Louisiana, 504 U.S. 71, 80, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). This concept dates *223 back to the Magna Carta, which guaranteed that “government would take neither life, liberty, nor property without a trial in accord with the law of the land.” Duncan v. Louisiana, 391 U.S. 145, 169, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Black, J., concurring). The “law of the land” at its core provides that “no man’s life, liberty or property be forfeited as a punishment until there has been a charge fairly made and fairly tried in a public tribunal.” In re Oliver, 333 U.S. 257, 278, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Thus, the Supreme Court has recognized that, because of the Due Process Clause, it “may freely be conceded” that as a “ ‘general rule’ ... the government may not detain a person prior to a judgment of guilt in a criminal trial.” United States v. Salerno, 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).
The Court, however, has permitted a limited number of specific exceptions to this general rule. Although some process is always required in order to detain an individual, in special situations detention based on process less than that attendant to a criminal conviction does not violate the Fifth Amendment. See, e.g., Kansas v. Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) (civil commitment of mentally ill sex offenders); Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (pretrial detention of dangerous adults); Schall v. Martin, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) (pretrial detention of dangerous juveniles); Addington v. Texas, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (civil commitment of mentally ill); Humphrey v. Smith, 336 U.S. 695, 69 S.Ct. 830, 93 L.Ed. 986 (1949) (courts martial of American soldiers). Among these recognized exceptions is the one on which the Government grounds its principal argument in this case: Congress may constitutionally authorize the President to order the military detention, without criminal process, of persons who “qualify as ‘enemy combatants,’ ” that is, fit within that particular “legal category.” Hamdi, 542 U.S. at 516, 522 n. 1, 124 S.Ct. 2633.[5]
The act of depriving a person of the liberty protected by our Constitution is a momentous one; thus, recognized exceptions to criminal process are narrow in scope and generally permit only limited periods of detention. See, e.g., Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). Moreover, regardless of possible “threat[s] to community safety” or “barriers to criminal prosecution,” post at 305 (Wilkinson, J., concurring in part and dissenting in part), the Government can never invoke an exception, and so detain a person without criminal pro *224 cess, unless the individual fits within the narrow legal category of persons to whom the exception applies.[6] For example, the Supreme Court has held that the Constitution does not permit the Government to detain a predatory sex criminal through a civil commitment process simply by establishing that he is dangerous, i.e., a “threat to community safety.” The civil commitment process may be substituted for criminal process only if the Government meets its statutory burden, that is, the Government demonstrates “proof of dangerousness” and “proof of some additional factor, such as a ‘mental illness’ or ‘mental abnormality.’ ” Hendricks, 521 U.S. at 358, 117 5.Ct. 2072.
In Hamdi, the plurality explained that precisely the same principles apply when the Government seeks to detain a person as an enemy combatant. Under the habe-as procedure prescribed in Hamdi, if the Government asserts an exception to the usual criminal process by detaining as an enemy combatant an individual with eon-stitutional rights, it must proffer evidence to demonstrate that the individual “qual-if[ies]” for this exceptional treatment. 542 U.S. at 516, 534, 124 S.Ct. 2633. Only after the Government has “put[] forth credible evidence that” an individual “meets the enemy-combatant criteria” does “the onus” shift to the individual to demonstrate “that he falls outside the [enemy combatant] criteria.” Id. at 534, 124 S.Ct. 2633. For, in this country, the military cannot seize and indefinitely detain an individual — particularly when the sole process leading to his detention is a determination by the Executive that the detention is necessary[7] — unless the Government demonstrates that he “qualiffies]” for this extraordinary treatment because he fits within the “legal category of enemy combatant.” Id. at 516, 522 n. 1, 124 S.Ct. 2633.
Moreover, when the Government contends, as it does here, that an individual with constitutional rights is an enemy *225 combatant and that such an individual's exclusive opportunity to escape indefinite military detention rests on overcoming presumptively accurate hearsay, courts must take particular care that the Government’s allegations demonstrate that the detained individual is not a civilian, but instead, as the Supreme Court has explained, “meets the enemy-combatant criteria.” Id. at 534, 124 S.Ct. 2633. For only such care accords with the “deeply rooted and ancient opposition in this country to the extension of military control over civilians.” Reid v. Covert, 354 U.S. 1, 33, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality).
These principles thus form the legal framework for consideration of the issues before us. Both parties recognize that it does not violate the Due Process Clause for the President to order the military to seize and detain individuals who “qualify” as enemy combatants for the duration of a war. They disagree, however, as to whether the evidence the Government has proffered, even assuming its accuracy, establishes that al-Marri fits within the “legal category of enemy combatant.” Hamdi 542 U.S. at 522 n. 1, 124 S.Ct. 2633. The Government principally contends that its evidence establishes this, and therefore the AUMF grants the President statutory authority to detain al-Marri as an enemy combatant. Alternatively, the Government asserts that the President has inherent constitutional authority to order al-Marri’s indefinite military detention. Al-Marri maintains that the proffered evidence does not establish that he fits within the “legal category of enemy combatant,” id., and so the AUMF does not authorize the President to order the military to seize and detain him, and that the President has no inherent constitutional authority to order this detention. We now turn to these contentions.
B.
The Government’s primary argument is that the AUMF, as construed by precedent and considered against “the legal background against which [it] was enacted,” i.e., constitutional and law-of-war principles, empowers the President to order the military to seize and detain al-Marri as an enemy combatant. The AUMF provides:
[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.
§ 2(a), 115 Stat. 224.[8] In considering the Government’s AUMF argument, we first note the limits the Government places on *226 its interpretation of this statute and then consider the Government’s central contention.
1.
Tellingly, the Deputy Solicitor General conceded at oral argument before the en banc court that the AUMF only authorizes detention of enemy combatants. Thus, the Government does not argue that the broad language of the AUMF authorizes the President to subject to indefinite military detention anyone he believes to have aided any “nation[ ], organization ], or person[ ]” related to the September 11th attacks. See § 2(a), 115 Stat. 224. Such an interpretation would lead to absurd results that Congress could not have intended.
Under that reading of the AUMF, the President would be able to subject to indefinite military detention anyone, including an American citizen, whom the President believed was associated with any organization that the President believed in some way “planned, authorized, committed, or aided” the September 11th attacks, so long as the President believed this to be “necessary and appropriate” to prevent future acts of terrorism.
Under such an interpretation of the AUMF, if some money from a nonprofit charity that feeds Afghan orphans made its way to al Qaeda, the President could subject to indefinite military detention any donor to that charity. Similarly, this interpretation of the AUMF would allow the President to detain indefinitely any employee or shareholder of an American corporation that built equipment used by the September 11th terrorists; or allow the President to order the military seizure and detention of an American-citizen physician who treated a member of al Qaeda.
Moreover, at oral argument, the Deputy Solicitor General also explicitly and properly acknowledged that exercise of power under the AUMF must be consistent with the Constitution. But to read the AUMF to provide the President with the unlimited power outlined above would present serious constitutional questions. For the Supreme Court has long recognized that the Due Process Clause “cannot be ... construed as to leave Congress free to make any process ‘due process of law,’ by its mere will.” See Murray v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 276-77, 15 L.Ed. 372 (1855).
2.
The Government’s arguments do not require us to deal with the absurd results, nor reach the constitutional concerns, raised by an interpretation of the AUMF that would authorize the President to detain indefinitely — without criminal charge or process' — anyone he believes to have aided any “nationf ], organization ], or person[]” related to the September 11th terrorists. See § 2(a), 115 Stat. 224. For the Government wisely limits its argument.[9] It relies only on the scope of the *227 AUMF as construed by precedent and considered in light of “the legal background against which [it] was enacted.” Specifically, the Government contends that “[t]he Supreme Court’s and this Court’s prior construction of the AUMF govern this case and compel the conclusion that the President is authorized to detain al-Marri as an enemy combatant.”
i.
The precedent interpreting the AUMF on which the Government relies for this argument consists of two cases: the Supreme Court’s opinion in Hamdi, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578, and our opinion in Padilla v. Hanft, 423 F.3d 386 (4th Cir.2005).[10] The “legal background” for the AUMF, which the Government cites, consists of two cases from earlier conflicts, Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (World War II), and Ex Parte Milligan, 71 U.S. (4 Wall.) 2, 18 L.Ed. 281 (1866) (U.S. Civil War), as well as constitutional and law-of-war principles.
With respect to the latter, we note that American courts have often been reluctant to follow international law in resolving domestic disputes. In the present context, however, they, like the Government here, have relied on the law of war — treaty obligations including the Hague and Geneva Conventions and customary principles developed alongside them. The law of war provides clear rules for determining an individual’s status during an international armed conflict, distinguishing between “combatants” (members of a nation’s military, militia, or other armed forces, and those who fight alongside them) and “civilians” (all other persons).[11] See, e.g., Geneva Convention Relative to the Treatment of Prisoners of War (Third Geneva Convention) arts. 2, 4, 5, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Fourth Geneva Convention) art. 4, Aug. 12,1949, 6 *228 U.S.T. 3516, 75 U.N.T.S. 287. American courts have repeatedly looked to these careful distinctions made in the law of war in identifying which individuals fit within the “legal category” of “enemy combatant” under our Constitution. See, e.g., Hamdi, 542 U.S. at 518, 124 S.Ct. 2633; Quinn, 317 U.S. at 30-31 & n. 7, 63 S.Ct. 2; Milligan, 71 U.S. at 121-22; Padilla, 423 F.3d at 391.
In the case at hand, the Government asserts that the construction given the AUMF in Hamdi and Padilla — based on these law-of-war principles — “compel[s] the conclusion that the President is authorized [by the AUMF] to detain al-Marri as an enemy combatant.” In other words, the Government contends that al-Marri fits within the “legal category” of persons that the Supreme Court in Hamdi, and a panel of this court in Padilla, held the AUMF authorized the President to detain as enemy combatants. Thus, we examine those cases to determine whether the interpretation of the AUMF they adopt does indeed empower the President to treat al-Marri as an enemy combatant.
In Hamdi, the Supreme Court looked to precedent and the law of war to determine whether the AUMF authorized the President to detain as an enemy combatant an American citizen captured while engaging in battle against American and allied armed forces in Afghanistan as part of the Taliban. See 542 U.S. at 518-22, 124 S.Ct. 2633. In support of that detention, the Government offered evidence that Yaser Esam Hamdi “affiliated with a Taliban military unit and received weapons training,” “took up arms with the Taliban,” “engaged in armed conflict against the United States” in Afghanistan, and, when captured on the battlefield, “surrendered] his Kalishnikov assault rifle.” Id. at 510, 513, 516, 124 S.Ct. 2633 (internal quotation marks omitted). Hamdi’s detention was upheld because, in fighting against the United States on the battlefield in Afghanistan with the Taliban, the de facto government of Afghanistan at the time,[12] Hamdi bore arms with the army of an enemy nation and so, under the law of war, was an enemy combatant. Id. at 518-20, 124 S.Ct. 2633.
The Hamdi Court expressly recognized that the AUMF did not explicitly provide for detention. Id. at 519, 124 S.Ct. 2633; see also id. at 547, 124 S.Ct. 2633 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). It concluded, however, “in light of’ the law-of-war principles applicable to Hamdi’s battlefield capture, that this was “of no moment” in the case before it. Id. at 519,124 S.Ct. 2633 (plurality). As the plurality explained, “[b]ecause detention to prevent a combatant’s return to the battlefield is a fundamental incident of waging war, in permitting the use of ‘necessary and appropriate force,’ Congress has clearly and unmistakably authorized detention in the narrow circumstances considered here.” Id. (emphasis added). Thus, the Hamdi Court reached the following limited holding: “the AUMF is explicit congressional authorization for the detention of individuals in the narrow category we describe,” that is, individuals who were “part of or *229 supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there.” Id. at 516-17, 124 S.Ct. 2633 (internal quotation marks omitted and emphasis added); accord id. at 587, 124 S.Ct. 2633 (Thomas, J., dissenting). The plurality explained that its opinion “only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual is, in fact, an enemy combatant.” Id. at 523, 124 S.Ct. 2633 (emphasis added). The plurality also cautioned that “[i]f the practical circumstances of a given conflict” differed from those of the traditional conflicts that informed the law of war, the understanding that the AUMF authorizes detention “may unravel.” Id. at 521, 124 S.Ct. 2633.
In Padilla, a panel of this court similarly held that the AUMF authorized the President to detain as an enemy combatant an American citizen who “was armed and present in a combat zone” in Afghanistan as part of Taliban forces during the conflict there with the United States. 423 F.3d at 390-91 (internal quotation marks omitted). The Government had not been able to capture Jose Padilla until he came to the border of the United States, but, because the Government presented evidence that Padilla “took up arms against United States forces in [Afghanistan] in the same way and to the same extent as did Hamdi,” we concluded that he “unquestionably qualifies as an ‘enemy combatant’ as that term was defined for the purposes of the controlling opinion in Hamdi.” Id. at 391.[13] We too invoked the law of war, upholding Padilla’s detention because we understood “the plurality’s reasoning in Hamdi to be that the AUMF authorizes the President to detain all those who qualify as ‘enemy combatants’ within the meaning of the law of war.” Id. at 392. We also noted that Padilla’s detention, like Hamdi’s, was permissible “ ‘to prevent a combatant’s return to the battlefield ... a fundamental incident of waging war.’ ” Id. at 391 (emphasis added) (quoting Hamdi, 542 U.S. at 519, 124 S.Ct. 2633).
Supreme Court precedent offered substantial support for the narrow rulings in Hamdi and Padilla. In Quirin, which the Hamdi plurality characterized as the “most apposite precedent,” 542 U.S. at 523, 124 S.Ct. 2633, the Supreme Court upheld the treatment, as enemy combatants, of men directed, outfitted, and paid by the German military to bring explosives into the United States to destroy American war industries during World War II. The Qui-rin Court concluded that even a petitioner claiming American citizenship had been properly classified as an enemy combatant because “[e]itizens who associate themselves with the military arm of the enemy government, and with its aid, guidance and direction enter this country bent on hostile acts, are enemy belligerents [combatants] within the meaning of ... the law of war.” 317 U.S. at 37-38, 63 S.Ct. 2. The Court *230 cited the Hague Convention “which defines the persons to whom belligerent [i.e., combatant] rights and duties attach,” id. at 30-31 n. 7, 63 S.Ct. 2, in support of its conclusion that the Quirin petitioners qualified as enemy combatants. Given the “declaration of war between the United States and the German Reich,” id. at 21, 63 S.Ct. 2, and that all the Quirin petitioners, including one who claimed American citizenship, were directed and paid by the “military arm” of the German Reich, the Court held that the law of war classified them as enemy belligerents (or combatants) and so the Constitution permitted subjecting them to military jurisdiction. Id. at 48, 63 S.Ct. 2.
Hamdi and Padilla ground their holdings on this central teaching from Quirin, i.e., enemy combatant status rests on an individual’s affiliation during wartime with the “military arm of the enemy government.” Quirin, 317 U.S. at 37-38, 63 S.Ct. 2; Hamdi, 542 U.S. at 519, 124 S.Ct. 2633; Padilla, 423 F.3d at 391. In Quirin, that enemy government was the German Reich; in Hamdi and Padilla, it was the Taliban government of Afghanistan.
Hamdi and Padilla also rely on this principle from Quirin to distinguish (but not disavow) Milligan. In Milligan, the Court rejected the Government’s impassioned contention that a presidential order and the “laws and usages of war,” 71 U.S. at 121-22, justified exercising military jurisdiction over Lamdin Milligan, an Indiana resident, during the Civil War. The Government alleged that Milligan had communicated with the enemy, had conspired to “seize munitions of war,” and had “join[ed] and aid[ed] ... a secret” enemy organization “for the purpose of overthrowing the Government and duly constituted authorities of the United States.” Id. at 6. The Court recognized that Milli-gan had committed “an enormous crime” during “a period of war” and at a place “within ... the theatre of military operations, and which had been and was constantly threatened to be invaded by the enemy.” Id. at 7, 130. But it found no support in the “laws and usages of war” for subjecting Milligan to military jurisdiction as a combatant, for although he was a “dangerous enem[y]” of the nation, he was a civilian and had to be treated as such. Id. at 121-22,130.
Quirin, Hamdi, and Padilla all emphasize that Milligan’s, teaching — that our Constitution does not permit the Government to subject civilians within the United States to military jurisdiction — remains good law. The Quirin Court explained that while the petitioners before it were affiliated with the armed forces of an enemy nation and so were enemy belligerents, Milligan was a “non-belligerent” and so “not subject to the law of war.” 317 U.S. at 45, 63 S.Ct. 2. The Hamdi plurality similarly took care to note that Milligan “turned in large part on the fact that Milligan was not a prisoner of war” (i.e., combatant) and suggested that “[h]ad Mil-ligan been captured while he was assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different.” 542 U.S. at 522, 124 S.Ct. 2633. And in Padilla, we reaffirmed that “Milligan does not extend to enemy combatants” and so “is inapposite here because Padilla, unlike Milligan, associated with, and has taken up arms against the forces of the United States on behalf of, an enemy of the United States.” 423 F.3d at 396-97. Thus, although Hamdi, Quirin, and Padilla distinguish Milligan, they recognize that its core holding remains the law of the land. That is, civilians within this country (even “dangerous enemies” like Milligan who perpetrate “enormous crime[s]” on behalf of “secret” enemy organizations bent on “overthrow *231 ing the Government” of this country) may not be subjected to military control and deprived of constitutional rights. Milli-gan, 71 U.S. at 6,130.[14]
In sum, the holdings of Hamdi and Padilla share two characteristics: (1) they look to law-of-war principles to determine who fits within the “legal category” of enemy combatant; and (2) following the law of war, they rest enemy combatant status on affiliation with the military arm of an enemy nation.
ii.
In view of the holdings in Hamdi and Padilla, we find it remarkable that the Government contends that they “compel the conclusion” that the President may detain al-Marri as an enemy combatant. For unlike Hamdi and Padilla, al-Marri is not alleged to have been part of a Taliban unit, not alleged to have stood alongside the Taliban or the armed forces of any other enemy nation, not alleged to have been on the battlefield during the war in Afghanistan, not alleged to have even been in Afghanistan during the armed conflict there, and not alleged to have engaged in combat with United States forces anywhere in the world. See Rapp Declaration (alleging none of these facts, but instead that “[a]l-Marri engaged in conduct in preparation for acts of international terrorism intended to cause injury or adverse effects on the United States”). Indeed, unlike Hamdi and Padilla, al-Marri had been imprisoned in the United States by civil authorities on criminal charges for more than a year before being seized by the military and indefinitely confined in a Navy brig as an enemy combatant.
In place of the “classic wartime detention” that the Government argued justified Hamdi’s detention as an enemy combatant, see Br. of Respondents at 20-21, 27, Ham-di, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578, or the “classic battlefield” detention it maintained justified Padilla’s, *232 see Opening Br. for the Appellant at 16, 20, 29, 51, Padilla, 423 F.3d 386, here the Government argues that al-Marri’s seizure and indefinite detention by the military in this country are justified “because he engaged in, and continues to pose a very real threat of carrying out, ... acts of international terrorism.” And instead of seeking judicial deference to decisions of “military officers who are engaged in the serious work of waging battle,” Hamdi, 542 U.S. at 531-32, 124 S.Ct. 2633, the Government asks us to defer to the “multi-agency evaluation process” of government bureaucrats in Washington made eighteen months after al-Marri was taken into custody. Neither the holding in Hamdi nor that in Padilla supports the Government’s contentions here.
In arguing to the contrary, the Government confuses certain secondary arguments it advanced in Hamdi and Padilla with the actual holdings in those cases. As discussed above, both Hamdi and Padilla upheld the President’s authority pursuant to the AUMF to detain as enemy combatants individuals (1) who affiliated with and fought on behalf of Taliban government forces, (2) against the armed forces of the United States and its allies, (3) on the battlefield in Afghanistan. In both cases, however, the Government also contended that the AUMF provided the President with even broader authority to subject to military detention, as enemy combatants, persons otherwise involved “in the global armed conflict against the al Qaeda terrorist network.” Br. of Respondents at 20-21, Hamdi, 542 U.S. 507, 124 S.Ct. 2633, 159 L.Ed.2d 578 (No. 03-6996); see Opening Br. for the Appellant at 17-18, Padilla, 423 F.3d 386 (No. 05-6396).
But neither the Supreme Court in Ham-di, nor this court in Padilla, accepted the Government’s invitation to fashion such a broad construction of the AUMF. Instead, the Hamdi plurality emphasized the narrowness of its holding, 542 U.S. at 509, 516-19, 124 S.Ct. 2633, and the “limited category” of individuals controlled by that holding, id. at 518, 124 S.Ct. 2633. In Padilla, we similarly saw no need to embrace a broader construction of the AUMF than that adopted by the Supreme Court in Hamdi. Indeed, the Government itself principally argued that Padilla was an enemy combatant because he, like Hamdi, “engaged in armed conflict” alongside the Taliban “against our forces in Afghanistan.” See Opening Br. for the Appellant at 22-23, 27, Padilla, 423 F.3d 386 (No. 05-6396).[15]
Thus, the Government is mistaken in its representation that Hamdi and Padilla “recognized” “[t]he President’s authority to detain ‘enemy combatants’ during the current conflict with al Qaeda.” Hamdi and Padilla evidence no sympathy for the view that the AUMF permits indefinite military detention beyond the “limited category” of people covered by the “narrow *233 circumstances” of those cases. Hamdi, 542 U.S. at 516-19, 124 S.Ct. 2633. Therefore the Government’s argument— that Hamdi and Padilla “compels the conclusion” that the AUMF authorizes the President “to detain al-Marri as an enemy combatant” — fails. Accord post at 259 (Traxler, J., concurring in the judgment).
3.
The Government offers no other legal precedent, rationale, or authority justifying its position that the AUMF empowers the President to detain al-Marri as an enemy combatant; indeed, at oral argument before the en banc court, the Government repeatedly emphasized that it argued only that al-Marri may be detained under the AUMF because he is an enemy combatant under established law-of-war principles explicated in Quirin and other precedent. Our dissenting colleagues go further, however. They contend that the definition of enemy combatant has somehow expanded to permit a person to be so classified because of his criminal conduct on behalf of a terrorist organization. We have searched extensively for authority that would support the dissents’ position; we have found none.
i.
First, the Supreme Court’s most recent terrorism cases — Hamdan and Boume-diene — provide no support for the dissenters’ position. In Hamdan, the Court held that because the conflict between the United States and al Qaeda in Afghanistan is not “between nations,” it is a “ ‘conflict not of an international character’ ” — and so is governed by Common Article 3 of the Geneva Conventions. See 126 S.Ct. at 2795; see also id. at 2802 (Kennedy, J., concurring).
Common Article 3 and other Geneva Convention provisions applying to non-international conflicts (in contrast to those applying to international conflicts) simply do not recognize the “legal category” of enemy combatant. See Third Geneva Convention, art. 3, 6 U.S.T. at 3318. As the International Committee of the Red Cross — the official codifier of the Geneva Conventions — explains, “an ‘enemy combatant’ is a person who, either lawfully or unlawfully, engages in hostilities for the opposing side in an international armed conflict”; in contrast, “[i]n non-international armed conflict combatant status does not exist.” Int’l Comm, of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism, at 1, 3 (Feb. 21, 2005), http://www.icrc.org/Web/Eng/ siteengO.nsflhtmlall/terrorismihl-210705 (emphasis added).[16]
Perhaps for this reason, our dissenting colleagues and the Government ignore *234 Hamdan’s holding that the conflict with al Qaeda in Afghanistan is a non-international conflict and ignore the fact that, in such conflicts, the legal category of enemy combatant does not exist. Indeed, the Government’s sole acknowledgment of Ham-dan is a short footnote in its appellate brief, in which it asserts that “the Court took it as a given that Hamdan was subject to detention as an enemy combatant during ongoing hostilities.” The weakness of this response is apparent. Not only does it avoid the holding in Hamdan that the conflict between the United States and al Qaeda is a non-international conflict, but also it improperly suggests that the Supreme Court approved Hamdan’s detention when the legality of that detention was not before the Court.
In fact, two years after Hamdan issued, the Court once again declined to resolve this very issue — the legality of the detention of those captured and detained in the conflict with al Qaeda outside the United States. See Boumediene, 128 S.Ct. at 2240 (expressly noting that the Court does “not address whether the President has authority to detain these petitioners” and that “questions regarding the legality of the detention are to be resolved in the first instance by the District Court”). Furthermore, in Boumediene, the Court demonstrated no more sympathy for the Government’s position than it had in any of the other recent terrorism cases. Rather, the Court expressly held that persons designated by the Executive “as enemy combatants” and held by United States forces at Guantanamo Bay must be afforded “the fundamental procedural protections of ha-beas corpus” guaranteed by our Constitution, even though they were foreign nationals who had been seized in foreign lands. Id. at 2277. The Court explained that “[t]he laws and Constitution are designed to survive, and remain in force, in extraordinary times.” Id. at 2277.
Moreover, even were the Supreme Court ultimately to approve the detention of Boumediene, Hamdan, and those like them, that would not bolster the view that the Government can militarily detain al-Marri as an enemy combatant.[17] Because the legal status of enemy combatant does not exist in non-international conflicts, the law of war leaves the detention of persons in such conflicts to the applicable law of the detaining country. In al-Marri’s case, the applicable law is our Constitution. Under our Constitution, even if the Supreme Court should hold that the Government may detain indefinitely Boumediene, Hamdan, and others like them, who were captured outside the United States and lack substantial and voluntary connections to this country, that holding would provide no support for approving al-Marri’s military detention. For not only was al-Marri seized and detained within the United States, he also has substantial connections to the United States and so plainly is *235 protected by the Due Process Clause. See Wong Wing, 163 U.S. at 238, 16 S.Ct. 977; see also Verdugo-Urquidez, 494 U.S. at 271,110 S.Ct. 1056.
ii.
Other Supreme Court precedent similarly offers no support for the position that persons lawfully resident in this country entitled to the protections of our Constitution — even ordinary American citizens— can lose their civilian status and become enemy combatants if they have allegedly engaged in criminal conduct on behalf of, or associated with, an organization seeking to harm the United States. Of course, a person who commits a crime should be punished, but when a civilian protected by the Due Process Clause commits a crime, he is subject to charge, trial, and punishment in a civilian court, not to seizure and confinement by military authorities.
We recognize the understandable instincts of those who wish to treat domestic terrorists as “combatants” in a “global war on terror.” Allegations of criminal activity in association with a terrorist organization, however, do not permit the Government to transform a civilian into an enemy combatant subject to indefinite military detention, just as allegations of murder in association with others while in military service do not permit the Government to transform a civilian into a soldier subject to trial by court martial. See United States ex rel. Toth v. Quarles, 350 U.S. 11, 23, 76 S.Ct. 1, 100 L.Ed. 8 (1955) (holding that ex-servicemen, “like other civilians, are entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III of the Constitution”).
To be sure, enemy combatants may commit crimes just as civilians may. When an enemy combatant violates the law of war, that conduct will render the person an “unlawful” enemy combatant, subject not only to detention but also to military trial and punishment. Quirin, 317 U.S. at 31, 63 S.Ct. 2. But merely engaging in unlawful behavior does not make one an enemy combatant. Quirin illustrates these distinctions well. The Quirin petitioners were first enemy combatants — associating themselves with the military arm of the German government with which the United States was at war. They became unlawful enemy combatants when they violated the law of war by “without uniform comfing] secretly through the lines for the purpose of waging war.” Id. By doing so, in addition to being subject to military detention for the duration of the conflict as enemy combatants, they also became “subject to trial and punishment by military tribunals for acts which render their belligerency illegal.” Id. Had the Quirin petitioners never “secretly and without uniform” passed our “military lines,” id., they still would have been enemy combatants, subject to military detention, but would not have been unlawful enemy combatants subject to military trial and punishment.
Neither Quirin nor any other precedent even suggests, as our dissenting colleagues seem to believe, that individuals with constitutional rights, unaffiliated with the military arm of any enemy government, can be subjected to military jurisdiction and deprived of those rights solely on the basis of their conduct on behalf of a terrorist organization.[18] In fact, Milligan rejected *236 the Government’s attempt to do just this. There, the Court acknowledged that Milli-gan’s conduct — “joining and aiding” a “secret political organization, armed to oppose the laws, and seeking] by stealthy means to introduce the enemies of the country into peaceful communities, there to ... overthrow the power of the United States” — made him and his co-conspirators “dangerous enemies to their country.” 71 U.S. at 6, 130. But the Government did not allege that Milligan took orders from any enemy government or took up arms against this country on the battlefield. And so the Court held that the Government could not subject Milligan to trial by military tribunal or treat him as an enemy combatant subject to military detention as a prisoner of war. Milligan was an “enem[y] of the country” and associated with an organization seeking to “overthrow[ ] the Government” of this country, but he was still a civilian and had to be treated as one. Id.
Although Milligan involved a time in which our democracy was much younger, it dealt with a war fully as threatening to our country as any present conflict. See id. at 88 (noting the Government’s argument that Milligan’s military detention must be permitted because “the facts are unprecedented” as is “the war out of which they grew”). Today, the Government contends that the fate of our nation requires the military detention of al-Marri and others lawfully resident in this country because of their membership in a terrorist organization. A century ago, the Government similarly contended that the military detention of Milligan and other members of the Sons of Liberty lawfully resident in this country was necessary to “save the nation” from the terrorist plots of the “one hundred thousand men enrolled in” that organization. Id. at 102,104. Thus Milligan, “one of [the Court’s] great landmarks,” Reid, 354 U.S. at 30, 77 S.Ct. 1222, firmly and clearly rejected the argument the Government asserts here. The weakness of the dissents’ brief attempts to distinguish Mil-ligan attests to the strength of the precedent. (The concurrence does not even attempt a distinction.)
First, one of our dissenting colleagues maintains that “reliance on Milligan” is “misplaced” because its principles “apply only after it has been determined” that an individual “is a civilian, not a combatant.” Post at 326-27 (Wilkinson, J., concurring in part and dissenting in part); see also post at 301. This contention ignores the Milligan Court’s express rejection of the *237 Government’s argument that Milligan, even if not subject to military trial, could be held by the military as a prisoner of war during the duration of hostilities. See Milligan, 71 U.S. at 131. As the Hamdi plurality noted, that Milligan was not a combatant and therefore not a prisoner of war was “central to” the Milligan holding. 542 U.S. at 522, 124 S.Ct. 2633 (noting if “Milligan [had] been captured while ... assisting Confederate soldiers by carrying a rifle against Union troops on a Confederate battlefield, the holding of the Court might well have been different”). Thus, reliance on Milligan is hardly “misplaced”: there, the Supreme Court unequivocally rebuffed an argument precisely parallel to the one the Government makes here — that an unarmed civilian captured in his home in the United States, rather than while “carrying a rifle ... on a ... battlefield,” could be “detained under military authority for the duration of the conflict.” See id.
Second, and equally unconvincing, the dissenters apparently believe that the enactment of the AUMF makes Milligan’s case distinguishable from al-Marri’s. See post at 286 (Williams, C.J., concurring in part and dissenting in part) (acknowledging that Milligan governs the rights of civilians but nevertheless finding that the AUMF permits the President to declare al-Marri an enemy combatant); post at 301 (Wilkinson, J., concurring in part and dissenting in part) (asserting that because Congress did not authorize use of military force against “the Sons of Liberty, Milli-gan’s organization,” but did, in the AUMF, authorize the use of force against “al Qae-da, al-Marri’s organization,” Milligan’s “constitutional force” does not apply). This argument clearly fails, too, for, as we discuss in detail in the following section, it misreads the AUMF. As the Government expressly conceded at oral argument, the AUMF authorizes the detention of only enemy combatants. The AUMF does not purport to alter the definition of enemy combatant and so provides no basis for distinguishing al-Marri from Milligan or determining that al-Marri or anyone else “plainly qualifies” as an enemy combatant. Post at 301 (Wilkinson, J., concurring in part and dissenting in part).
In sum, the dissents have not — and cannot — distinguish Milligan. The Government’s allegations against Milligan mirror the Government’s allegations against al-Marri. If the Government’s allegations here are true, like Milligan, al-Marri is deplorable, criminal, and dangerous, but, like Milligan, he is a civilian nonetheless and must be treated as one — for Congress certainly has not directed otherwise. Thus, we believe that the indefinite detention of al-Marri must cease.[19]
*238 iii.
Moreover, the AUMF does not assist our dissenting colleagues. The AUMF clearly states that it is “intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution.” § 2(b), 115 Stat. 224. And under the War Powers Resolution, such statutory authorization permits the President to “exercise[]” his powers “as Commander-in-Chief to introduce United States Armed Forces into hostilities” and to remain engaged in such hostilities for longer than sixty days. 50 U.S.C.A. §§ 1541(c), 1544(b) (West 2003). Thus, to say that Congress did not have a dramatic expansion of the Executive’s military detention power in mind when it passed the AUMF is not “to say that Congress had very little in mind at all.” Post at 298 (Wilkinson, J., concurring in part and dissenting in part). Rather, it is to say that in the AUMF, as in other general authorizations for the use of force passed pursuant to the War Powers Resolution, Congress intended to provide the statutory authorization that it insists is required before the President may engage the United States Armed Forces in extended hostilities abroad.
At least some of our dissenting colleagues, however, apparently believe that enactment of the AUMF not only “activated the President’s war powers,” Ha/mdan, 126 S.Ct. at 2775, but also substantially expanded and redefined the legal category of enemy combatant. They are wrong. Plainly, the AUMF is not “a specific and targeted congressional directive” aimed at which individuals “may be detained[] for purposes of domestic law.” Post at 286 (Williams, C.J., concurring in part and dissenting in part). Rather, precisely because the AUMF contains only a broad grant of war powers and lacks any specific language authorizing detention, the Ha/m-di plurality explained that its opinion “only finds legislative authority to detain under the AUMF once it is sufficiently clear that the individual is, in fact, an enemy combatant.” 542 U.S. at 523, 124 S.Ct. 2633 (emphasis added). Although the military *239 detention of enemy combatants like Hamdi is certainly “a fundamental incident of waging war,” id. at 519, 124 S.Ct. 2633, the military detention of civilians like al-Marri just as certainly is not.
Even assuming the Constitution permitted Congress to grant the President such an awesome and unprecedented power, if Congress intended to grant this authority, it could and would have said so explicitly. The AUMF lacks the particularly clear statement from Congress that would, at a minimum, be necessary to authorize the indefinite military detention of civilians as enemy combatants. See, e.g., Greene v. McElroy, 360 U.S. 474, 508, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) (rejecting Government argument that executive orders and statutes permitted deprivation of liberty rights absent “explicit authorization”); Duncan v. Kahanamoku, 327 U.S. 304, 324, 66 S.Ct. 606, 90 L.Ed. 688 (1946) (rejecting Government argument that statute authorized trial of civilians by military tribunals because Congress could not have intended “to exceed the boundaries between military and civilian power, in which our people have always believed”); Ex Parte Endo, 323 U.S. 283, 300, 65 S.Ct. 208, 89 L.Ed. 243 (1944) (rejecting Government argument that a “wartime” executive order and statute permitted detention of citizen of Japanese heritage when neither “use[d] the language of detention”); Brown v. United States, 12 U.S. (8 Cranch) 110, 128-29, 3 L.Ed. 504 (1814) (rejecting Government argument that declaration of war authorized confiscation of enemy property because it did not clearly “declare[]” the legislature’s “will”). We are exceedingly reluctant to infer a grant of authority that is so far afield from anything recognized by precedent or law-of-war principles, especially given the serious constitutional concerns it would raise.
Additionally, nothing in the legislative history of the AUMF supports the view that Congress intended the AUMF to provide the President with the unprecedented power claimed here.[20] In fact, the legislative history suggests just the opposite— that in the AUMF Congress intended neither to expand the definition of enemy combatant to include civilians nor to authorize the military seizure and detention of civilians within the United States. Senator Daschle has recounted that “[laterally minutes before the Senate cast its vote” on the AUMF, “the administration sought to add the words ‘in the United States and’ after ‘appropriate force’ in the agreed-upon text” to give “the President broad authority to exercise expansive powers not just overseas — where we all understood he wanted authority to act — but right here in the United States, potentially against American citizens.” Tom Daschle, Editorial, Power We Didn’t Grant, Wash. Post, Dec. 23, 2005, at A21. The Senate refused to “accede to this extraordinary request for additional authority.” Id.; see also Wartime Executive Power and the National Security Agency’s Surveillance Au *240 thority: Hearings Before the S. Comm, on the Judiciary, 109th Cong. 126 (2006) (statement of Sen. Specter, Chairman, S. Comm, on the Judiciary) (“[The proposal to add ‘in the United States’] was rejected since it would give the President broad authority not just overseas, but also in the United States.”). The congressional debates on the AUMF similarly indicate that key members of Congress believed that the AUMF only authorized the use of military force abroad, not within the United States. See, e.g., 147 Cong. Rec. 17,047 (2001) (statement of Sen. Biden) (“In extending this broad authority to cover those ‘planning, authorizing, committing, or aiding the attacks’ it should go without saying, however, that the resolution is directed only at using force abroad to combat acts of international terrorism.” (emphasis added)); 147 Cong. Rec. 17,111 (2001) (statement of Rep. Lantos) (“The resolution before us empowers the President to bring to bear the full force of American power abroad in our struggle against the scourge of international terrorism.” (emphasis added)).
Furthermore, the day after Congress enacted the AUMF, it began consideration of another statute, which it enacted a few weeks later, that did explicitly authorize the President to arrest and detain “terrorist aliens” living within the United States believed to have come here to perpetrate acts of terrorism. See Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub.L. No. 107-56, 115 Stat. 272 [hereinafter Patriot Act].[21] However, the Patriot Act only authorizes detention for a limited time pending deportation or trial, accompanied by civilian law enforcement processes and careful congressional oversight; it expressly prohibits “indefinite detention” of “terrorist aliens.” The explicit authorization for limited detention and criminal process in civilian courts in the Patriot Act provides still another reason why we cannot assume that in the AUMF Congress silently empowered the President to order the indefinite military detention of civilian “terrorist aliens” as enemy combatants without any criminal process.
We note that this does not mean that we accept al-Marri’s contention that the Patriot Act affirmatively prohibits the detention of all suspected terrorist aliens within this country as enemy combatants. Plainly, *241 the Patriot Act does not eliminate the statutory authority provided the President in the AUMF to detain individuals who fit within the “legal category” of enemy combatant; thus, if an alien “qualif[ies]” as an enemy combatant, then the AUMF authorizes his detention. Hamdi, 542 U.S. at 516, 124 S.Ct. 2633. But if there were any conflict between the Patriot Act and the AUMF as to the legality of the detention of terrorist alien civilians within the United States, we would have to give precedence to the Patriot Act — for while the Patriot Act’s explicit and specific focus is on detention of terrorist aliens within the United States, the AUMF lacks any language permitting such detention. See id. at 519, 124 S.Ct. 2633. And the Supreme Court has instructed that “a more specific statute will be given precedence over a more general one, regardless of their temporal sequence.” Busic v. United States, 446 U.S. 398, 406, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); see also Edmond v. United States, 520 U.S. 651, 657, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997).[22]
iv.
Finally, we do not find our dissenting colleagues’ respective new definitions of enemy combatant at all compelling. The dissents do not contend that, under traditional law-of-war principles, enemy combatant status would extend to al-Marri. See, e.g., post at 286 (Williams, C.J., concurring in part and dissenting in part) (“The plurality opinion may very well be correct that, under the traditional ‘law of war,’ persons not affiliated with the military of a nation-state may not be considered enemy combatants.”); post at 316, 320-21 (Wilkinson, J., concurring in part and dissenting in part) (“Traditionally, the definition of ‘enemy’ has been state-based .... ”).[23] Instead, to justify al-Marri’s indefinite military detention, the dissents *242 resort to inventing novel definitions of enemy combatant, drawing on their own beliefs as to when detention is appropriate. That these judicially-created definitions differ so markedly from one another follows from the fact that each is simply the product of judicial conjecture; any limits on whom the Executive may detain as an enemy combatant are thus left to an individual judge. This is particularly troubling because, as our distinguished colleague has observed, “ ‘it is difficult to conceive of an area of governmental activity in which the courts have less competence’ than military affairs.” Post at 303 (Wilkinson, J., concurring in part and dissenting in part) (quoting Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973)).
Moreover, Supreme Court precedent seems to foreclose the dissenters’ rejection of traditional law-of-war principles. On every occasion in which the Court has considered — even tangentially — the important issues at stake in this case, it has invoked and relied on traditional law-of-war principles for guidance. See, e.g., Quirin, 317 U.S. at 27-38 (“From the very beginning of its history this Court has recognized and applied the law of war-”). Indeed, one of the dissenters somewhat grudgingly recognizes this. See post at 322 (Wilkinson, J., concurring in part and dissenting in part) (acknowledging that “[t]he Supreme Court insists we consult” traditional law-of-war principles in determining enemy combatant status).
In Hamdi, the Court had the opportunity to interpret the AUMF to incorporate new definitions like those proposed by the dissenters, but it refused to do so. Rather, the Court continued to hue closely to traditional and “longstanding law-of-war principles.” 542 U.S. at 521, 124 S.Ct. 2633. Of course, the Hamdi plurality noted that “[tjhe permissible bounds” of “[t]he legal category of enemy combatant” would “be defined by the lower courts as subsequent cases are presented to them.” Id. at 522 n. 1, 124 S.Ct. 2633. But nothing in any of the Hamdi opinions suggests that lower courts, absent express congressional authorization, are free to venture beyond traditional law-of-war principles to fashion these “permissible bounds.” Reading Hamdi to permit such an action is a huge leap. For four times in as many pages the Hamdi plurality cautioned that it was only willing to find that the AUMF authorized detention, as an enemy combatant, of a person who fit within “the narrow category” presented — a person affiliated with an enemy nation, captured on a battlefield, and engaged in armed conflict against the United States. Id. at 516-19, 124 S.Ct. 2633. Contrary to our dissenting colleague’s contentions, these traditional law-of-war principles are hardly “quaint” or “outmoded.” Post at 293, 322, 328-29 (Wilkinson, J., concurring in part and dissenting in part). Rather, as the Supreme Court recently counseled, “[ejstablished legal doctrine ... must be consulted for its teaching. Remote in time it may be; irrelevant to the present it is not.” Bourne-diene, 128 S.Ct. at 2277.
Furthermore, on the very same day that the Court issued Hamdi, four Justices expressly declared that in their view the AUMF “does not authorize ... the protracted, incommunicado detention of American citizens arrested in the United States.” Rumsfeld v. Padilla, 542 U.S. 426, 464 n. 8, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004) (Stevens, J., dissenting, joined by Souter, Ginsburg, & Breyer, JJ.) (emphasis added). Although Justice Scalia declined to reach the issue in Padilla, when dissenting in Hamdi he similarly rejected the argument that the AUMF authorized the detention of United States citizens absent invocation of the Suspension Clause, *243 stating that the AUMF did not “authorize[ ] detention of a citizen with the clarity necessary to satisfy the interpretive canon that statutes should be construed so as to avoid grave constitutional concerns.” 542 U.S. at 554, 574, 124 S.Ct. 2633. Given that the Government has now expressly conceded that aliens lawfully residing in the United States, like al-Marri, have the same due process rights as citizens, it would seem that a majority of the Court not only would reject the new definitions that the dissents propose, but in fact has already done so.
Although we respect our colleagues’ hard work, we also find the specific rationales they offer in support of their respective new definitions totally unpersuasive.
a.
Judge Williams finds that in the AUMF, Congress has authorized the indefinite military detention, as an “enemy combatant,” of any individual “who meets two criteria: (1) he attempts or engages in belligerent acts against the United States, either domestically or in a foreign combat zone; (2) on behalf of an enemy force.” Post at 285-86. Her definition requires neither an affiliation with an enemy nation nor capture on a battlefield, nor anything else but attempted injurious acts “against the United States” on behalf of some hostile, organized group. As we have explained above, this new definition finds no support in the AUMF, Hamdi, or Quiñn. We note that Judge Williams appears to place substantial weight on Quinn’s reference to “enemy belligerents, including those acting under the direction of the armed forces of the enemy,” 317 U.S. at 37, 63 S.Ct. 2 (emphasis added), to conclude that an enemy combatant need only be affiliated with an “enemy force,” rather than a nation-state. Post at 285-86. She ignores the fact that the Court in Quirin defined “armed forces” in accord with traditional law-of-war principles as forces of “belligerent nations.” 317 U.S. at 30, 63 S.Ct. 2 (emphasis added).
Judge Williams attempts to limit the indefinite nature of the detention allowed under her broad definition of enemy combatant by associating al-Marri with ongoing hostilities in Afghanistan. See post at 286-87. But this invocation of a specific conflict in a specific country does nothing to circumscribe her construction of the AUMF, which imposes no limits on detention as long as somewhere in the world, someone is attempting belligerent acts against the United States on behalf of an “enemy force.” Indeed, in response to questions from the en banc court, the Deputy Solicitor General admitted that in the Government’s view, the Executive could hold an individual like al-Marri in military custody without charges, not just until the end of the conflict in Afghanistan, but “during the course of’ all “ongoing hostilities,” which he conceded could be “for a long time.” Cf. Boumediene, 128 S.Ct. at 2262 (noting that the duration of the current conflict “is already among the longest wars in American history”).
In sum, by abandoning precedent ■ and traditional law-of-war principles, Judge Williams renders the term “enemy combatant” utterly malleable. Such a definition presents serious constitutional concerns. For an amorphous definition like that proposed by Judge Williams, lacking any of the limits provided by precedent and traditional law-of-war principles, simply will not ensure that “detention without trial ‘is the carefully limited exception,’ ” rather than the rule. Hamdi, 542 U.S. at 529, 124 S.Ct. 2633 (quoting Salerno, 481 U.S. at 755, 107 S.Ct. 2095); see also supra n. 19. We cannot agree that in the AUMF Congress replaced the narrow, es *244 tablished definition of enemy combatant with such a vague and unbounded one.
b.
Judge Wilkinson takes a very different, but no more persuasive, approach. Unlike every other member of this court, he maintains that the AUMF must be interpreted solely in terms of its broad language. See post at 296-303. Under this approach, the AUMF yields no definition of enemy combatant and thus, as Judge Wilkinson acknowledges, imposes no “limiting principle on enemy combatant detentions.” Post at 322. Recognizing the necessity for such limits, Judge Wilkinson then creates constitutional criteria for establishing enemy combatant status. He proposes that to be classified as an enemy combatant subject to indefinite military detention:
[a] person must (1) be a member of (2) an organization or nation against whom Congress has declared war or authorized the use of military force, and (3) knowingly plans or engages in conduct that harms or aims to harm persons or property for the purpose of furthering the military goals of the enemy nation or organization.
Post at 325. He explains, praises, and then applies these criteria to al-Marri, unsurprisingly concluding that al-Marri meets them and therefore is an enemy combatant. Post at 322-29. Without in any way denigrating Judge Wilkinson’s extensive efforts, we do not believe that the approach he advocates is open to us. In addition to the problems set forth above, several other factors make such an approach untenable.
First, Judge Wilkinson’s statutory analysis cannot be reconciled with that of the Supreme Court in Hamdi. There, the Court expressly relied on traditional law-of-war principles to interpret the AUMF. 542 U.S. at 517-21, 124 S.Ct. 2633. Indeed, just this term, when discussing Hamdi, the Supreme Court characterized the holding of that case as resting on traditional law-of-war principles, explaining that the “detention of individuals who fought against the United States in Afghanistan ... is so fundamental and accepted an incident to war” that it constitutes “an exercise of the necessary and appropriate force Congress has authorized the President to use.” Boumediene, 128 S.Ct. at 2240-41 (internal quotation marks omitted). Thus, although Judge Wilkinson defends his statutory analysis by asserting that we must “giv[e the] text [of the AUMF] some semblance of the meaning that Congress intended for it,” post at 313, he utterly fails to acknowledge that the Supreme Court has twice held that the AUMF evinces Congress’s intent to incorporate established law-of-war principles.
Second, by refusing to construe the AUMF through the lens of traditional law-of-war principles, as Hamdi did (and we do), Judge Wilkinson ignores a construction that avoids constitutional difficulties and instead chooses one that abounds in them. See post at 312 (recognizing the “serious constitutional issues that result” from giving full effect to the broad language of the AUMF); see also post at 295-96, 313-14, 322-24. This approach clearly violates the settled constitutional avoidance doctrine, which requires that, whenever possible, a statute be construed to avoid rather than “raise serious constitutional problems.” See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (collecting cases). The Supreme Court has repeatedly stressed the importance of this doctrine. See, e.g., Spector Motor Serv. v. McLaughlin, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) (explaining that this doctrine is “more deeply rooted than *245 any other in the process of constitutional adjudication”). Thus, when, as here, a court can choose between a construction of a statute that avoids constitutional problems and one that “would raise” them, the former “prevail[s].” Clark v. Martinez, 543 U.S. 371, 380-82, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005). Because “one of the [doctrine’s] chief justifications is that it allows courts to avoid the decision of constitutional questions,” a court must avoid an interpretation that raises serious constitutional questions regardless of whether the court’s concerns are borne out on full consideration. Id. at 381, 125 S.Ct. 716 (emphasis in original). Of particular relevance here, a court must avoid an interpretation that raises serious constitutional questions “whether or not those constitutional problems pertain to the particular litigant before the Court.” Id.
Nor do the difficulties with Judge Wilkinson’s approach end with his statutory analysis. After rejecting reliance on law-of-war principles in interpreting the AUMF, Judge Wilkinson makes the startling contention that his constitutional criteria for defining enemy combatant “conform to the evolving principles of the law of war.” Post at 322. We find it very strange indeed that he refuses to accord law-of-war principles any statutory relevance but then ascribes them a constitutional significance that would limit both the executive and legislative branches. Moreover, Judge Wilkinson offers no legal authority for the assertion that the law of war has in fact “evolved” to provide a basis for his proposed criteria, other than his own “emphatic[ ] contention]” that it has. Post at 322.[24] As Judge Wilkinson acknowledges, changes in the law of war typically appear in treaties or international agreements, see post at 315, yet no treaty or agreement suggests any change in or evolution from the traditional law-of-war definition of enemy combatant.
Perhaps recognizing the difficulties outlined above, the Government has not in any of its extensive legal briefs or during its lengthy oral arguments espoused Judge Wilkinson’s criteria either as a basis for interpreting the AUMF or as an independent set of constitutional limits on executive and congressional authority. Rather, when pressed at oral argument as to the source of the criteria for determination of enemy combatant status in this case, the Deputy Solicitor General assured us that the Government relied only on the traditional law-of-war principles articulated in Hamdi and Quirin.
*246 In the last analysis, Judge Wilkinson’s approach seems to be driven by his undoubtedly sincere belief that his new criteria best identify those individuals who should qualify as enemy combatants in our conflict with al Qaeda. Perhaps so. However, surely the determination of who should be classified as an enemy combatant is a task best left in the first instance to the political branches. See Boumediene, 128 S.Ct. at 2276 (recognizing that when judges consider “the procedural and substantive standards used to impose detention to prevent acts of terrorism, proper deference must be accorded to the political branches”). Neither the President nor Congress has indicated any intent or desire to adopt Judge Wilkinson’s new definition of enemy combatant. Rather, both political branches have been content to be guided by the traditional law-of-war principles against which the AUMF was enacted.
Given the total absence of authority for Judge Wilkinson’s approach, we cannot adopt it, particularly in view of the Government’s considered failure to champion this approach. Before concluding our discussion of Judge Wilkinson’s position, we want to acknowledge his stirring statements as to why criminal process is ill-suited to deal with the unique problems presented by the prosecution of terrorists. Post at 306-09. But see Richard B. Zabel & James J. Benjamin, Jr., In Pursuit of Justice: Prosecuting Terrorism, Cases in the Federal Courts 5 (2008) (analyzing data from over one hundred international terrorism cases prosecuted in U.S. federal courts and concluding that the criminal justice “system is generally well-equipped to handle most terrorism cases”). Whatever the merits of Judge Wilkinson’s statements, we want to be clear that our rejection of his approach does not stem from some sort of “preference” for the criminal justice system. Post at 303. We reject Judge Wilkinson’s position because we conclude, for all of the reasons set forth above, that al-Marri is a civilian, and our Constitution demands, not prefers, that civilians be afforded the rights inherent in that system.[25]
*247 V.
In sum, neither the Government nor our dissenting colleagues have offered, and although we have exhaustively searched, we have not found, any authority that permits us to hold that the AUMF empowers the President to detain al-Marri as an enemy combatant. If the Government’s allegations are true, and we assume they are for present purposes, al-Marri, like Milligan, is a dangerous enemy of this nation who has committed serious crimes and associated with a secret terrorist organization that has engaged in hostilities against us. But, like Milligan, al-Marri is still a civilian: he does not fit within the “permissible bounds of’ “[t]he legal category of enemy combatant.” Hamdi, 542 U.S. at 522 n. 1, 124 S.Ct. 2633. Therefore, we believe the AUMF provides the President no statutory authority to order the military to seize and indefinitely detain al-Marri.
C.
Thus, we turn to the Government’s final contention. The Government summarily argues that even if the AUMF does not authorize al-Marri’s seizure and indefinite detention as an enemy combatant, the President has “inherent constitutional authority” to order the military to seize and detain al-Marri. According to the Government, the President’s “war-making powers” afford him “inherent” authority to subject persons legally residing in this country and protected by our Constitution to military arrest and detention, without the benefit of any criminal process, if the President believes these individuals have “engaged in conduct in preparation for acts of international terrorism.” See Rapp Declaration. Given that the Government has now acknowledged that aliens lawfully residing in the United States have the same due process rights as United States citizens, this is a breathtaking claim — and one that no member of the court embraces.
To assess claims of presidential power, the Supreme Court has long recognized, as Justice Kennedy stated most recently, that courts look to the “framework” set forth by Justice Jackson in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). See Hamdan, 126 S.Ct. at 2800 (Kennedy, J., concurring). Justice Jackson explained that “Presidential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress.” Youngstown, 343 U.S. at 635, 72 S.Ct. 863 (Jackson, J., concurring). “When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum,” id., but “[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb,” id. at 637, 72 S.Ct. 863. Hence, to evaluate the President’s constitutional claim, we must first look to the “expressed or implied will of Congress” as to detention of aliens cap *248 tured within the United States alleged to be engaged in terrorist activity.
1.
In contrast to the AUMF, which is silent on the detention of asserted alien terrorists captured and held within the United States, in the Patriot Act, enacted shortly after the AUMF, Congress carefully stated how it wished the Government to handle aliens believed to be terrorists who were seized and held within the United States. The Patriot Act provides the Executive with broad powers to deal with “terrorist aliens,” but it explicitly prohibits their indefinite detention.
Section 412 of the Patriot Act, entitled “Mandatory Detention of Suspected Terrorists,” permits the short-term “[d]etention of [terrorist [ajliens.” Patriot Act § 412(a). The statute authorizes the Attorney General to detain any alien whom he “has reasonable grounds to believe”: (1) “seeks to enter the United States” to “violate any law of the United States relating to espionage or sabotage” or to use “force, violence, or other unlawful means” in opposition to the government of the United States; (2) “has engaged in a terrorist activity”; or (3) is “likely to engage after entry in any terrorist activity,” has “incited terrorist activity,” is a “representative” or “member” of a “terrorist organization,” is a “representative” of a “group that endorses or espouses terrorist activity,” or “has received military-type training” from a terrorist organization. Id; 8 U.S.C.A. § 1182(a)(3)(A)-(B) (West 2007); see also 8 U.S.C.A. § 1227(a)(4)(A)©, (a)(4)(A)(iii), (a)(4)(B) (West 2007). In addition, the Patriot Act authorizes the Attorney General to detain any other alien who “is engaged in any other activity that endangers the national security of the United States.” Patriot Act § 412(a). In particular, the Patriot Act permits the Attorney General to “take into custody” any “terrorist aliens” based only on the Attorney General’s “belie[fs]” as to the aliens’ threat, with no process or evidentiary hearing, and judicial review available only through petition for habeas corpus. Id.
Recognizing the breadth of this grant of power, however, Congress also imposed strict limits in the Patriot Act on the duration of the detention of such “terrorist aliens” within the United States. Thus, the Patriot Act expressly prohibits unlimited “indefinite detention”; instead it requires the Attorney General either to begin “removal proceedings” or to “charge the alien with a criminal offense” “not later than 7 days after the commencement of such detention.” Id. If a terrorist alien’s removal “is unlikely for the reasonably foreseeable future,” he “may be detained for additional periods of up to six months” if his release “will threaten the national security of the United States.” Id. But no provision of the Patriot Act allows for unlimited indefinite detention. Moreover, the Attorney General must provide the legislature with reports on the use of this detention authority every six months, which must include the number of aliens detained, the grounds for their detention, and the length of the detention. Id. § 412(c).
Therefore, the Patriot Act establishes a specific method for the Government to detain aliens affiliated with terrorist organizations who the Government believes have come to the United States to endanger our national security, conduct espionage and sabotage, use force and violence to overthrow the government, engage in terrorist activity, or are likely to engage in any terrorist activity. Congress could not have better described the Government’s allegations against al-Marri — and Congress decreed that individuals so described are not to be detained indefinitely, but *249 only for a limited time, and only by civilian authorities, prior to deportation or criminal prosecution.
In sum, Congress has carefully prescribed the process by which it wishes to permit detention of “terrorist aliens” within the United States, and it has expressly prohibited the indefinite detention the President seeks here. The Government’s argument that the President may indefinitely detain al-Marri is thus contrary to Congress’s expressed will. “When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.” Youngstown, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring). As the Supreme Court has recently explained, “[w]hether or not the President has independent power ... he may not disregard limitations that Congress has, in proper exercise of its own war powers, placed on his powers.” Hamdan, 126 S.Ct. at 2774 n. 23 (citing Youngstown, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring)). In such cases, “Presidential claim[s]” to power “must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.” Youngstown, 343 U.S. at 638, 72 S.Ct. 863 (Jackson, J., concurring).
2.
In light of the Patriot Act, therefore, we must “scrutinize! ] with caution” the Executive’s contention that the Constitution grants the President the power to capture and subject to indefinite military detention certain civilians lawfully residing within the United States. Id. The Government nowhere suggests that the President’s inherent constitutional power to detain does not extend to American citizens. Yet it grounds its argument that the President has constitutional power to detain al-Marri on his alien status. Even though at oral argument before the en banc court the Government acknowledged that an alien legally resident in the United States has the same due process rights as an American citizen, the Government apparently maintains that alien status permits the President to exercise special “peak” authority over legally resident aliens like al-Marri. The Government can so contend only by both ignoring the undisputed and relying on the inapposite.
It is undisputed that al-Marri had been legally admitted to the United States, was attending an American university from which he had earlier received an undergraduate degree, and was legally residing here (with his family) for several months before the Government arrested him at his home in Peoria. The Government’s refusal to acknowledge these undisputed facts dooms its contention that al-Marri’s status as an alien somehow provides the President with special “peak” authority to deprive al-Marri of constitutional rights. For, as we have noted within, and as the Government itself has conceded on rehearing, the Supreme Court has repeatedly and expressly held that aliens like al-Mar-ri, i.e., those lawfully admitted into the United States who have “developed substantial connections with this country,” are entitled to the Constitution’s due process protections. Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056; see also Sanchez-Llamas, 126 S.Ct. at 2681-82; Kwong Hai Chew, 344 U.S. at 596, 73 S.Ct. 472; Wong Wing, 163 U.S. at 238, 16 S.Ct. 977. No case suggests that the President, by fiat, can eliminate the due process rights of such an alien.
Without even a mention of these undisputed facts and controlling legal principles, the Government relies on two sorts of *250 inapposite cases as assertedly establishing special presidential authority over aliens like al-Marri. The first of these, Eisentrager, 339 U.S. at 769 n. 2, 70 S.Ct. 936, and Ludecke, 335 U.S. at 161-62, 68 S.Ct. 1429, involves “enemy aliens.” In those cases, the Supreme Court specifically defined “enemy aliens,” but the Court did not define them as aliens who commit crimes against our country and so are enemies, as the Government seems to suggest. Rather, the Supreme Court defined “enemy aliens” as “subject[s] of a foreign state at war with the United States.” Eisentrager, 339 U.S. at 769 n. 2, 70 S.Ct. 936. Al-Marri plainly is not the “subject of a foreign state at war with the United States” and so is not an “enemy alien,” but rather is a citizen of Qatar, a country with which the United States has friendly relations. Thus Eisentrager and Ludecke provide no basis for asserting authority over al-Marri. In fact, elsewhere in its brief, the Government concedes, as it must, that Eisentrager and Ludecke do not “have direct application” to al-Marri.
The other inapposite cases on which the Government relies involve congressional authority over aliens stemming from Congress’s power over naturalization and immigration — not some special “inherent” constitutional authority enjoyed by the President over aliens. See Mathews v. Diaz, 426 U.S. 67, 79-80, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); Harisiades v. Shaughnessy, 342 U.S. 580, 588-91, 72 S.Ct. 512, 96 L.Ed. 586 (1952). These cases do not speak to the powers of the President acting alone — let alone contrary to an Act of Congress — and certainly do not suggest that the President has the power to subject to indefinite military detention an alien lawfully residing in this country.
In sum, al-Marri is not a subject of a country with which the United States is at war, he did not illegally enter the United States, and he is not alleged to have committed any other immigration violation. Rather, after lawfully entering the United States, al-Marri “developed substantial connections with this country,” Verdugo-Urquidez, 494 U.S. at 271, 110 S.Ct. 1056, and so his status as an alien neither eliminates his due process rights nor provides the President with extraordinary powers to subject al-Marri to seizure and indefinite detention by the military. The President’s constitutional powers do not allow him to order the military to seize and detain indefinitely al-Marri without criminal process any more than they permit the President to order the military to seize and detain, without criminal process, other terrorists within the United States, like the Unabomber or the perpetrators of the Oklahoma City bombing.
3.
In light of al-Marri’s due process rights under our Constitution and Congress’s express prohibition in the Patriot Act on the indefinite detention of those civilians arrested as “terrorist aliens” within this country, we can only conclude that, in the case at hand, the President claims power that far exceeds that granted him by the Constitution.
We do not question the President’s wartime authority over enemy combatants, but absent suspension of the writ of habeas corpus, the Constitution simply does not provide the President the power to exercise military authority over civilians within the United States. See Toth, 350 U.S. at 14, 76 S.Ct. 1 (“[Ajssertion of military authority over civilians cannot rest on the President’s power as commander-in-chief.”). The President cannot eliminate constitutional protections with the stroke of a pen by proclaiming a civilian, even a criminal civilian, an enemy combatant sub *251 ject to indefinite military detention. Put simply, the Constitution does not empower the President to order the military to seize civilians residing within the United States and detain them indefinitely without criminal process, and this is so even if he calls them “enemy combatants.”
A “well-established purpose of the Founders” was “to keep the military strictly within its proper sphere, subordinate to civil authority.” Reid, 354 U.S. at 80, 77 S.Ct. 1222. In the Declaration of Independence, our forefathers lodged the complaint that the King of Great Britain had “affected to render the Military independent of and superior to the Civil power” and objected that the King had “deprived] us in many cases, of the benefits of Trial by Jury.” The Declaration of Independence paras. 14, 20 (U.S. 1776). Thus, a resolute conviction that civilian authority should govern the military animated the framing of the Constitution. As Alexander Hamilton, no foe of executive power, observed, the President’s Commander-in-Chief powers “amount to nothing more than the supreme command and direction of the military and naval forces.” The Federalist No. 69, at 386 (Alexander Hamilton) (Clinton Rossiter ed., 1961). “That military powers of the Commander in Chief were not to supersede representative government of internal affairs seems obvious from the Constitution and from elementary American history.” Youngstown, 343 U.S. at 644, 72 S.Ct. 863 (Jackson, J., concurring) (emphasis added). For this reason, in Youngstown, the Supreme Court rejected the President’s claim to “inherent power” to use the military even to seize property within the United States, despite the Government’s argument that the refusal would “endanger the well-being and safety of the Nation.” Id. at 584, 72 S.Ct. 863 (majority opinion).
Of course, this does not mean that the President lacks power to protect our national interests and defend our people, only that in doing so he must abide by the Constitution. We understand and do not in any way minimize the grave threat international terrorism poses to our country and our national security. But as Milli-gan teaches, “the government, within the Constitution, has all the powers granted to it, which are necessary to preserve its existence.” 71 U.S. at 121. Those words resound as clearly in the twenty-first century as they did in the nineteenth.
Thus, the President plainly has plenary authority to deploy our military against terrorist enemies overseas. See Curtiss-Wright, 299 U.S. at 319-20, 57 S.Ct. 216; see also Eisentrager, 339 U.S. at 789, 70 S.Ct. 936. Similarly, the Government remains free to defend our country against terrorist enemies within, using all the considerable powers “the well-stocked statutory arsenal” of domestic law affords. Hamdi, 542 U.S. at 547, 124 S.Ct. 2633 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment) (citing numerous federal statutes criminalizing terrorist acts). Civilian law enforcement officers may always use deadly force whenever reasonable. See Scott v. Harris, — U.S. -, 127 S.Ct. 1769, 1776-78, 167 L.Ed.2d 686 (2007). Furthermore, in the wake of September 11th, Congress has specifically authorized the President to deploy the armed forces at home to protect the country in the event of actual “terrorist attack[s] or incident^]” within the United States meeting certain conditions. See 10 U.S.C.A. § 333(a)(A) (West 2007) (amending the Insurrection Act to provide the President with this authority, notwithstanding the Posse Comitatus Act, 18 U.S.C. § 1385).
But in this nation, military control cannot subsume the constitutional rights of *252 civilians. Rather, the Supreme Court has repeatedly catalogued our country’s “deeply rooted and ancient opposition ... to the extension of military control over civilians.” Reid, 354 U.S. at 33, 77 S.Ct. 1222; see also Laird v. Tatum, 408 U.S. 1, 15, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (Burger, C.J.) (recognizing “a traditional and strong resistance of Americans to any military intrusion into civilian affairs” that “has deep roots in our history and found early expression ... in the constitutional provisions for civilian control of the military”). The Court has specifically cautioned against “breaking] faith with this Nation’s tradition” — “firmly embodied in the Constitution” — “of keeping military power subservient to civilian authority.” Reid, 354 U.S. at 40, 77 S.Ct. 1222. When the Court wrote these words in 1957, it explained that “[t]he country ha[d] remained true to that faith for almost one hundred seventy years.” Id. Another half century has passed, but the necessity of “remaining] true to that faith” remains as important today as it was at our founding. See id.
The President has cautioned us that “[t]he war on terror we fight today is a generational struggle that will continue long after you and I have turned our duties over to others.” Pres. George W. Bush, State of the Union Address (Jan. 23, 2007). Unlike detention for the duration of a traditional armed conflict between nations, detention for the length of a “war on terror” has no bounds. Justice O’Connor observed in Hamdi that “[i]f the practical circumstances of a given conflict are entirely unlike those of the conflicts that informed the development of the law of war,” the understanding that combatants can be detained “for the duration of the relevant conflict” “may unravel.” 542 U.S. at 521, 124 S.Ct. 2633. If the indefinite military detention of an actual combatant in this new type of conflict might cause the thread of our understandings to “unravel,” the indefinite military detention of a civilian like al-Marri would shred those understandings apart.
In an address to Congress at the outset of the Civil War, President Lincoln defended his emergency suspension of the writ of habeas corpus to protect Union troops moving to defend the Capital. Lincoln famously asked: “[A]re all the laws, but one, to go unexecuted, and the government itself to go to pieces, lest that one be violated?” Abraham Lincoln, Message to Congress in Special Session (July 4, 1861), in Abraham Lincoln: Speeches and Writings 1859-1865 at 246, 254 (Don E. Feh-renbacher ed., 1989). The authority the President seeks here turns Lincoln’s formulation on its head. For the President does not acknowledge that the extraordinary power he seeks would result in the suspension of even one law, and he does not contend that this power should be limited to dire emergencies that threaten the nation. Rather, he maintains that the authority to order the military to seize and detain certain civilians is an inherent power of the Presidency, which he and his successors may exercise as they please.
To sanction such presidential authority to order the military to seize and indefinitely detain civilians, even if the President calls them “enemy combatants,” would have disastrous consequences for the Constitution — and the country. For a court to uphold a claim to such extraordinary power would do more than render lifeless the Suspension Clause, the Due Process Clause, and the rights to criminal process in the Fourth, Fifth, Sixth, and Eighth Amendments; it would effectively undermine all of the freedoms guaranteed by the Constitution. It is that power — were a court to recognize it — that could lead all our laws “to go unexecuted, and the government itself to go to pieces.” We refuse to recognize a claim to power that would *253 so alter the constitutional foundations of our Republic.
III.
Because we find that neither the AUMF nor the President’s inherent authority permits the military to detain al-Marri indefinitely as an enemy combatant, we would not reach the question of whether the Government has afforded al-Marri sufficient process to challenge his designation as an enemy combatant. We would simply reverse the judgment of the district court and remand the case with instructions to issue a writ of habeas corpus directing the Secretary of Defense to release al-Marri from military custody within a reasonable period of time to be set by the district court. Pursuant to this directive, the Government could transfer al-Marri to civilian authorities to face criminal charges, initiate deportation proceedings against him, hold him as a material witness in connection with grand jury proceedings, or detain him for a limited time pursuant to the Patriot Act, but military detention of al-Marri would have to cease.
This disposition, however, does not command a majority of the en banc court. Accordingly, to give practical effect to the conclusions of the majority of the court who reject the Government’s position, we join in ordering remand on the terms closest to those we would impose. See Hamdi 542 U.S. at 553, 124 S.Ct. 2633 (Souter, J., concurring in part, dissenting in part, and concurring in the judgment). We believe that it is unnecessary to litigate whether al-Marri is an enemy combatant, but joining in remand for the evidentiary proceedings outlined by Judge Traxler will at least place the burden on the Government to make an initial showing that normal due process protections are unduly burdensome and that the Rapp declaration is “the most reliable available evidence,” supporting the Government’s allegations before it may order al-Marri’s military detention. See post at 273-74. Therefore, we concur in the per curiam opinion reversing and remanding for evidentiary proceedings to determine whether al-Marri actually is an enemy combatant subject to military detention.
Judges Michael, King, and Gregory have authorized me to indicate that they join in this opinion.

. As noted above, the en banc court — like the panel — has concluded that the judgment of the district court denying Ali Saleh Kahlah al-Marri habeas relief must be reversed. The opinion that follows incorporates some of the rationale originally contained in the now vacated panel opinion, Al-Marri v. Wright, 487 F.3d 160 (4th Cir.2007). It also includes substantial additions and revisions applying intervening Supreme Court precedent and responding to the arguments on rehearing of the Government and of our colleagues. See, e.g., infra at 217-19 & n. 2, 221, 223-24 & n. 6, 226-27 & nn. 9-10, 232-33, 233-35, 235-47 & nn. 18-25, 247, 248-50, 252-54.

. One of the dissenters repeatedly insists that we are really suggesting that the Constitution prohibits the detention of al-Marri. See, e.g., ' post at 294, 304-05, 312-13, 314 n. 5, 322, 327 (Wilkinson, J., concurring in part and dissenting in part). In fact, the panel explicitly refused to so hold, see Al-Marri, 487 F.3d at 193 n. 17, and we refuse to do so here. Because Congress has not empowered the President to subject civilians within the United States to indefinite military detention, we need not, and do not, determine whether such a grant of authority would violate the Constitution.

. Numerous amici have submitted briefs to us, both on the jurisdictional and merits questions. Many of these briefs have been helpful, and we are especially grateful for the care exhibited in focusing on different issues, thus avoiding redundancy.

. Hence, the case at hand involves — and we limit our analysis to — persons seized and detained within the United States who have constitutional rights under the Due Process Clause.

. Case law also establishes that during times of war Congress may constitutionally authorize the President to detain "enemy aliens/' also known as “alien enemies,” defined as “subject[s] of a foreign state at war with the United States.” Johnson v. Eisentrager, 339 U.S. 763, 769 n. 2, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (internal quotation marks omitted); see Ludecke v. Watkins, 335 U.S. 160, 68 S.Ct. 1429, 92 L.Ed. 1881 (1948). And the Government can detain potentially dangerous resident aliens for a limited time pending deportation. See, e.g., Carlson v. Landon, 342 U.S. 524, 537-42, 72 S.Ct. 525, 96 L.Ed. 547 (1952); cf. Zadvydas, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (construing a statute's authorization of post-removal-period detention not to permit indefinite detention of aliens in order to avoid serious doubt as to its constitutionality). But, as the Government recognizes, the Alien Enemy Act, the statute the Court considered in Eisentrager and Lu-decke, does not apply to al-Marri's case. In fact, al-Marri is not an “enemy alien” but a citizen of Qatar, with which the United States has friendly diplomatic relations. The Government also does not seek to deport al-Marri. Therefore, neither of these exceptions is offered by the Government as a basis for holding al-Marri without criminal charge, and neither is applicable here.

. Furthermore, the Supreme Court has never permitted an exception to criminal process merely on the basis of judicial fears as to "threat[s] to community safety” or "barriers to criminal prosecution.” See post at 305 (Wilkinson, J., concurring in part and dissenting in part). Rather, the Court has permitted such exceptions only when a legislative body has explicitly authorized the exception. See, e.g., Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (Bail Reform Act of 1984); Scholl, 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (New York Family Court Act); Addington, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (Texas statute governing involuntary commitment on mental health grounds); Hendricks, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (Kansas Sexually Violent Predator Act). Accordingly, it is hardly surprising that, despite the broad language of the AUMF, the Supreme Court in Hamdi found only that the statute provided congressional authorization for the military detention of an enemy combatant as that term is defined by traditional law-of-war principles. And, even more recently, in Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 2775, 165 L.Ed.2d 723 (2006), the Court expressly refused to read the broad language of the AUMF to "expand the President's authority to convene military commissions,” instead finding that this authority was limited by traditional law-of-war principles "[a]bsent a more specific congressional authorization.”

. Hamdi recognizes that the sole process that the Government need provide in order to initially detain an enemy combatant is a presidential determination that the detention is necessary. 542 U.S. at 518, 124 S.Ct. 2633. Of course, Hamdi also reaffirms that the writ of habeas corpus provides a remedy to challenge collaterally the legality of the ongoing detention. Id. at 525-26, 124 S.Ct. 2633. Although the habeas remedy follows from the Suspension Clause, the Hamdi plurality borrowed the due process balancing approach from Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to design the specific requirements of this habeas remedy. Hamdi, 542 U.S. at 525-35, 124 S.Ct. 2633.

. Although the Government asserts in a footnote that the Military Commissions Act (MCA) of 2006, Pub.L. No. 109-366, 120 Stat. 2600, "buttresses” the President's "inherent authority” to detain al-Marri, it does not assert that the MCA provides statutory authority to detain enemy combatants. Plainly, the MCA could not provide the Government with authority to subject al-Marri to indefinite military detention, since Congress did not enact the MCA until October 16, 2006, more than three years after the President ordered al-Marri’s indefinite military detention. Moreover, the MCA addresses only whether a detained individual is an unlawful enemy combatant subject to military trial, pursuant to specific statutory procedures, not whether, in the first instance, an individual with constitutional rights seized in this country qualifies as an enemy combatant subject to indefinite military detention. Accord post at 328 n. 9 (Wilkinson, J., concurring in part and dissenting in part).

. Chief Judge Williams and Judge Wilkinson each take a different approach; we address each of these approaches within. We note here, however, a basic inconsistency in both dissenters' reasoning. Both first heavily rely on the broad language of the AUMF as authorizing al-Marri’s detention, but then explicitly recognize the difficulties with interpreting the statute to give effect to this broad language. Judge Williams dismisses the definition of enemy combatant under "the traditional ‘law of war’ ” because, she contends, the AUMF "controls ... for purposes of domestic law,” but she then acknowledges that giving full force to that statute "might produce absurd results.” Post at 286 & n. 4. Judge Wilkinson goes even further. He initially points to the breadth of the AUMF language and chides us for refusing to give it full effect, post at 296-303, but ultimately he himself also refuses to give this language full effect. Rather, Judge Wilkinson properly recognizes the "constitu *227 tional limits on what Congress can authorize the executive to do,” and given those limits, he contends that to "qualify constitutionally” for treatment as an enemy combatant under the AUMF, an individual must fit within his three newly created criteria. Post at 312, 314-15. With these new criteria firmly in place, Judge Wilkinson maintains that our suggestion that the actual language of the AUMF would produce unconstitutional or absurd results, for example rendering donors to a nonprofit charity enemy combatants, is "beyond hyperbole.” Post at 323.

. Of course, Padilla does not bind this court, but we consider it because the Government has heavily relied upon it, and it is in no way inconsistent with our conclusion that al-Marri is not an enemy combatant.

. Thus, "civilian” is a term of art in the law of war, not signifying an innocent person, but rather someone in a certain legal category who is not subject to military seizure or detention. So, too, a "combatant” is by no means always a wrongdoer, but rather a member of a different "legal category” who is subject to military seizure and detention. Hamdi, 542 U.S. at 522 n. 1, 124 S.Ct. 2633. For example, our brave soldiers fighting in Germany during World War II were "combatants” under the law of war, and viewed from Germany’s perspective they were "enemy combatants.” While civilians are subject to trial and punishment in civilian courts for all crimes committed during wartime in the country in which they are captured and held, combatant status protects an individual from trial and punishment by the capturing nation, unless the combatant has violated the law of war. See id. at 518, 124 S.Ct. 2633; Quirin, 317 U.S. at 28-31, 63 S.Ct. 2. Nations in international conflicts can summarily remove the adversary's “combatants,” i.e., the "enemy combatants,” from the battlefield and detain them for the duration of such conflicts, but no such provision is made for "civilians.” Hamdi, 542 U.S. at 518, 124 S.Ct. 2633; Quinn, 317 U.S. at 28-31, 63 S.Ct. 2.

. See White House Fact Sheet: Status of Detainees at Guantanamo (Feb. 7, 2002), http://www.pegc.us/archiveAVhite — House/ 20020207_WH_POW_fact_sheet.txt; see also Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), June 8, 1977, arts. 43-44, 1125 U.N.T.S. 3 (defining combatants in conflicts between nations as members, other than chaplains and medical personnel, of "all organized armed forces, groups and units which are under a command responsible to that [nation] for the conduct of its subordinates").

. Although our opinion discussed Padilla's association with al Qaeda, we held that Padilla was an enemy combatant because of his association with Taliban forces, i.e., Afghanistan government forces, on the battlefield in Afghanistan during the time of the conflict between the United States and Afghanistan. Padilla, 423 F.3d at 391. Al-Marri urges us to ignore Padilla, particularly in light of its subsequent history. See Padilla v. Hanft, 432 F.3d 582, 583 (4th Cir.2005) (noting that the Government’s transfer of Padilla to civilian custody for criminal trial after arguing before this court that he was an enemy combatant created "an appearance that the government may be attempting to avoid consideration of our decision by the Supreme Court”). That history is troubling, but we see no need to avoid Padilla since its narrow holding does not in any way conflict with our conclusion here.

. Because of this important principle, the Supreme Court has hailed Milligan as "one of the great landmarks in th[e] Court's history.” Reid, 354 U.S. at 30, 77 S.Ct. 1222. Although in its appellate brief the Government largely avoids Milligan, it implicitly acknowledges this point and so attempts to distinguish Milli-gan from the case at hand on the ground that Milligan was a citizen and al-Marri an alien. In some circumstances, the Constitution does afford aliens less protection than citizens. See, e.g., Hamdi, 542 U.S. at 558-59, 124 S.Ct. 2633 (Scalia, J., dissenting) (suggesting that during war the constitutional rights of an "enemy alien,” whom the Supreme Court has defined as a "subject of a foreign state at war with the United States,” Eisentrager, 339 U.S. at 769 n. 2, 70 S.Ct. 936 (internal quotation marks omitted), differ from those of a treasonous citizen); Verdugo-Urquidez, 494 U.S. at 274-75, 110 S.Ct. 1056 (holding that the Fourth Amendment does not apply to searches by United States agents of property owned by aliens in foreign countries). But the distinction between citizens and aliens provides no basis for depriving an alien like al-Marri, lawfully resident within the United States and not the subject of an enemy nation, of those rights guaranteed by the Due Process Clause. Rather, the Supreme Court has repeatedly held that aliens situated like al-Marri have an unquestioned right to the due process of law. See Sanchez-Llamas, 126 S.Ct. at 2681-82; Zadvydas, 533 U.S. at 693, 121 S.Ct. 2491; Wong Wing, 163 U.S. at 238, 16 S.Ct. 977; see also Verdugo-Urquidez, 494 U.S. at 271, 494 U.S. at 278, 110 S.Ct. 1056 (Kennedy, J., concurring) (observing that “[a]ll would agree ... that the dictates of the Due Process Clause of the Fifth Amendment protect” an alien lawfully within the United States). The Government does not dispute or distinguish these cases in its appellate brief; it simply ignores them. At oral argument before the en banc court, however, the Government finally acknowledged that an alien legally resident in the United States, like al-Marri, has the same Fifth Amendment due process rights as an American citizen. For this reason, the Government had to concede that if al-Marri can be detained as an enemy combatant, then the Government can also detain any American citizen on the same showing and through the same process.

. In doing so, the Government acknowledged, Opening Br. for the Appellant at 29-30, Padilla, 423 F.3d 386 (No. 05-6396), our distinguished colleague Judge Wilkinson's statement that "[t]o compare [Hamdi’s] battlefield capture to the domestic arrest in Padilla v. Rumsfeld is to compare apples and oranges,” Hamdi v. Rumsfeld, 337 F.3d 335, 344 (4th Cir.2003) (Wilkinson, J., concurring in the denial of rehearing en banc), but explained that Judge Wilkinson's observation came before the Government had proffered any evidence that Padilla had carried arms alongside the Taliban against United States armed forces during the conflict in Afghanistan. In other words, at the time Judge Wilkinson differentiated Hamdi from Padilla, the Government’s allegations against Padilla mirrored its allegations against al-Marri here— that he had associated with al Qaeda and engaged in conduct in preparation for acts of terrorism. We agree with Judge Wilkinson’s characterization: to compare Hamdi's battlefield capture to the domestic arrest of al-Marri is indeed "to compare apples and oranges.” Id.

. Notwithstanding this principle, we recognize that some commentators have suggested that "for such time as they take a direct part in hostilities,” participants in non-international armed conflicts may, as a matter of customary international law, be placed in the formal legal category of enemy combatant. See, e.g., Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L.Rev. 2047, 2115 & n. 304 (2005) [hereinafter Bradley & Goldsmith] (internal quotation marks omitted). No precedent from the Supreme Court or this court endorses this view, and the Government itself has not advanced such an argument. This may be because even were a court to follow this approach in some cases, it would not assist the Government here. For the Government has proffered no evidence that al-Marri has taken a “direct part in hostilities.” Moreover, the United States has elsewhere adopted a formal treaty understanding of the meaning of the term "direct part in hostilities,” which plainly excludes al-Marri. See Message from the President of the United States Transmitting Two Optional Protocols to the Convention on the Rights of the Child, S. Treaty Doc. No. 106-37, at VII (2000) (distinguishing between "immediate and actual action on the battlefield” and "indirect participation,” including gathering and *234 transmitting military information, weapons, and supplies).

. The Supreme Court did not hold in Boum-ediene or Hamdan that there is a non-international armed conflict between the United States and al Qaeda within the United States. Non-international conflicts "occur[] in the territory of one of the High Contracting Parties,” Hamdan, 126 S.Ct. at 2795 (emphasis added) (quoting Third Geneva Convention, 6 U.S.T. at 3318) — and Hamdan only found there to be a conflict between the United States and al Qaeda in Afghanistan. Of course, al-Marri is not a participant in any conflict involving the United States in Afghanistan. Although the Government alleges that al-Marri attended an al Qaeda training camp in Afghanistan years before September 11th, it has proffered no evidence that al-Marri was involved in the conflict between the United States and al Qaeda in Afghanistan — nor could it, for al-Marri has not been in Afghanistan at any point during that conflict.

. The distinction between organizations and nations is not without rationale. The law of war does not classify persons affiliated with terrorist organizations as enemy combatants for fear that doing so would immunize them from prosecution and punishment by civilian authorities in the capturing country. See, e.g., Message from the President of the United States Transmitting the Protocol II Additional to the 1949 Geneva Conventions, and Relating to the Protection of Victims of Non-international Armed Conflicts, S. Treaty Doc. No. *236 100-2, at IV (1987) (explaining President Reagan’s recommendation against ratifying a treaty provision that "would grant combatant status to irregular forces” and so "give recognition and protection to terrorist groups”).
Moreover, a rule permitting indefinite military detention of members of a "terrorist” organization as enemy combatants, in addition to being contrary to controlling precedent, Milligan, 71 U.S. at 130, could well endanger citizens of this country or our allies. For example, a nation could employ this rule to treat American members of an environmental group, which it regards as a terrorist organization, as enemy combatants and so subject those Americans to indefinite military detention. Under definitions as nebulous as the ones proposed by our dissenting colleagues, these fears are hardly "completely unfounded.” See post at 323 (Wilkinson, J., concurring in part and dissenting in part). Foreign leaders who have already designated members of these environmental organizations "terrorists” might well, applying the dissents' definitions, conclude that those individuals are enemy combatants and thus detain them indefinitely without criminal process. See Hiroko Tabuchi, Japanese Are Hunting Humpbacks, Record (N.N.J.), Nov. 18, 2007, at A10 (reporting that some Japanese leaders regard activists for Greenpeace, an organization with 2.8 million members, as terrorists); Amanda Hodge, Japan Warship “Sent to Help Whalers", Australian, Jan. 2, 2006, at 3 (same).

. We note that the Government's treatment of al-Marri, i.e., subjecting him to military detention, which the Government insists "is not ‘punishment,’ " is at odds with the Government's repeated recognition that criminal terrorist conduct by aliens in this country merits punishment by a civilian court, not indefinite military detention as an enemy combatant. See, e.g., United States v. Abdi, 463 F.3d 547, 550 (6th Cir.2006) (civilian prosecution of suspected al Qaeda terrorist who allegedly "indicated a desire to 'shoot up’ a Columbus shopping mall with an AK-47”); United States v. Moussaoui, 382 F.3d 453 (4th Cir.2004) (civilian prosecution of al Qaeda conspirator involved in the September 11th attacks); United States v. Reid, 369 F.3d 619, 619-20 (1st Cir.2004) (civilian prosecution of terrorist allied with Bin Laden who attempted to destroy airplane with explosives); United States v. Goba, 240 F.Supp.2d 242, 244 (W.D.N.Y.2003) (civilian prosecution of associates of al Qaeda, including those who met with Bin Laden and trained , in terrorist camps in Afghanistan). And after long contending he was an enemy combatant, the Government ultimately prosecuted even Jose Padilla in civilian court for his crimes. This practice is hardly new. Even the civilian co-conspirators of the Quirin petitioners were tried for their crimes in civilian courts. See *238 Cramer v. United States, 325 U.S. 1, 65 S.Ct. 918, 89 L.Ed. 1441 (1945); United States v. Haupt, 136 F.2d 661 (7th Cir.1943).
The Government’s treatment of others renders its decision to halt al-Marri’s criminal prosecution — on the eve of a pre-trial hearing on a suppression motion — puzzling at best. Al-Marri contends that the Government has subjected him to indefinite military detention, rather than see his criminal prosecution to the end, in order to interrogate him without the strictures of criminal process. We trust that this is. not so, for such a stratagem would contravene Hamdi’s injunction that “indefinite detention for the purpose of interrogation is not authorized.” 542 U.S. at 521, 124 S.Ct. 2633. We note, however, that not only has the Government offered no other explanation for abandoning al-Marri’s prosecution, it has even propounded an affidavit in support of al-Marri’s continued military detention, stating that he "possesses information of high intelligence value.” See Rapp Declaration. Moreover, former Attorney General John Ashcroft has explained that the Government decided to declare al-Marri an enemy combatant only after he became a "hard case” by ”reject[ing] numerous offers to improve his lot by ... providing information.” John Ashcroft, Never Again: Securing America and Restoring Justice 168-69 (2006). The Government’s recent admission in other litigation that it has subjected al-Marri to repeated interrogation during his imprisonment in the Naval Brig would seem to substantiate al-Marri's contention. See Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, ¶¶ 8, 9, Ex. 2 in Def.’s Resp. to Pl.’s Mot. for Preservation Order and Inquiry into Spoliation of Evidence, Al-Marri v. Gates, No. 2:05-cv-02259-HFF-RSC (D.S.C. Apr. 30, 2008) (stating that, although "a number of recordings of the Al-Marri interrogation sessions ... were destroyed during the time period between December 1, 2004, and March 31, 2005,” "subsequent investigation revealed ... original or duplicate recordings of nine interrogation sessions”).

. Judge Wilkinson challenges our reliance on legislative history. Post at 300-01. But none of our conclusions rests solely, or even principally, on analysis of the legislative history of the AUMF and the Patriot Act. We fully recognize that several of the statements to which we cite were made after the enactment of those statutes. But these statements — both those made contemporaneously and those made after the fact — do nevertheless provide further evidence regarding the limited scope di the AUMF. See Boumediene, 128 S.Ct. at 2243 (approving as "correct” reliance on “legislative history when construing” a related statute, the MCA). Moreover, we cannot help but observe that although Judge Wilkinson criticizes us for relying on comments from the "distinguished members of the legislative branch,” post at 300, he himself relies extensively on comments of those much further removed from the legislative process— distinguished legal academics.

. The legislative history of the Patriot Act (originally titled the Anti-Terrorism Act of 2001) indicates that the Administration initially requested the power to indefinitely detain "terrorist aliens” within the United States. But in legislative hearings, members of both parties fiercely objected to this authorization, and several viewed authorization of indefinite detention as unconstitutional. See, e.g., Homeland Defense: Hearing Before the S. Comm, on the Judiciary, 107th Cong. 18, 26, 28 (2001); Administration’s Draft Anti-Teirorism Act of 2001: Hearings Before the H. Comm, on the Judiciary, 107th Cong. 21, 40, 54 (2001). In the course of these hearings, no one — no legislator and no member of the Administration — suggested that the AUMF already granted the President the power to order indefinite military detention of some terrorists within the United States. Congressional opposition to indefinite detention ultimately forced the Administration to accept elimination of indefinite detention from the Patriot Act. See Patriot Act § 412(a); see also 147 Cong. Rec. 19,507 (2001) (Senator Hatch relating that "Senator Kennedy, Senator Kyi, and I worked out a compromise that limits the [detention] provision”); 147 Cong. Rec. 20,448 (2001) (Representative De-lahunt stating that negotiations had led to a "better bill” than that reflected in the initial proposal, which included authorization of indefinite detention). That the Administration and Congress felt the need during the hearings and markup to address indefinite detention of terrorists in such detail and at such length certainly suggests that no one believed that the AUMF, passed just days before the Patriot Act, already granted the President such authority.

. Judge Williams acknowledges that the Patriot Act prohibits indefinite detention of unarmed alleged terrorist aliens captured in the United States, and she recognizes that the Patriot Act, as the "more-specific provision[],” governs if it "deal[s] with the same subject matter” as the AUMF. Post at 287-88. Yet she refuses to recognize that her expansive interpretation of the AUMF permits indefinite detention of precisely the same persons (unarmed alleged terrorist aliens captured in the United States) whose indefinite detention is prohibited by the Patriot Act. The sole rationale Judge Williams offers for refusing to hold the Patriot Act controls given this conflict is that, in her view, the two statutes "refer” to presidential powers set forth in different sections of the Constitution and, therefore, should not be read to conflict. Post at 287-88 (suggesting that the Patriot Act "refer[s] to the President’s power” under the Take Care Clause, while the AUMF "relates to the Commander-in-Chief power”). Even if this view is correct, the Supreme Court has never suggested that this is a relevant consideration in determining whether two statutes conflict. Indeed, Judge Williams has not cited, and we have not found, any authority to support such an analysis. The Supreme Court has long directed that courts follow the "well settled rule” that a specific statute controls over a general one as a means to ascertain legislative intent. Townsend v. Little, 109 U.S. 504, 512, 3 S.Ct. 357, 27 L.Ed. 1012 (1883) (noting that when "general and specific provisions” are "in apparent contradiction, whether in the same or different statutes,” the specific will "qualify[] and supply[] exceptions to the general”); Kepner v. United States, 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114 (1904); see also Bulova Watch Co. v. United States, 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961) (collecting cases). Where — indeed whether— legislation "refer[s]” to a specific executive power permitting the President to enforce the congressional authorization matters not at all in making this determination.

. The concurrence takes a different view, apparently contending that traditional law-of-war principles permit the military detention of al-Marri and persons like him. See post at 262 (Traxler, J., concurring in the judgment). For the reasons set forth above, we disagree.

. In response to this assertion, Judge Wilkinson surprisingly contends that the AUMF provides "legal authority” for his view that the law of war has "evolved” to support his criteria. Post at 321-22. In none of the Supreme Court’s recent terrorism cases has it recognized the AUMF as evidencing any "evol[ution]” in law-of-war principles. To the contrary, the Court has consistently interpreted the AUMF as circumscribed by traditional law-of-war principles. Indeed, earlier in his opinion, Judge Wilkinson himself repeatedly and correctly recognizes that judges have consistently interpreted the AUMF in this manner. See, e.g., post at 314-15. Judge Wilkinson's contention that the AUMF evidences an evolution in law-of-war principles not only ignores governing precedent, it also creates an entirely circular argument. First, Judge Wilkinson finds it necessary to determine the "constitutional limits” on the authority granted by the AUMF. Post at 312. Then he posits that the “law of war ... informs” these constitutional limits on the AUMF. Post at 314-15. And finally he identifies the AUMF itself as the sole legal authority supporting his conception of the evolving law of war, which assertedly “informs” the constitutional limits on the AUMF. Post at 321-22. Of course, when a statute itself somehow informs the principles governing the constitutional review of the power it authorizes, the constitutionality of that authorization inevitably follows.

. Judge Wilkinson also contends that the military detention of al-Marri and persons like him strikes the proper ''balance” between criminal prosecution and military detention, that "the best way to maximize liberty for all” is to remove such persons from the criminal justice system so as not to "dilute the core protections of” that system, and that extending criminal process to these people "risks pushing the executive ... in a more extreme direction.” Post at 309-10. If true, this might provide some sort of philosophical (albeit not legal) justification for al-Marri’s military detention. But recent admissions by the Administration itself, in fact, indicate that military detention in the recent conflicts has not achieved the proper "balance,” but rather has permitted the Executive to pursue a very "extreme direction.” In this vein, we note the admission by CIA director Michael Hayden that the CIA waterboarded al Qaeda suspects in order to extract intelligence, see Dan Eggen, White House Defends CIA’s Use of Wa-terboarding in Interrogations, Wash. Post, Feb. 7, 2008, at A3; Hayden’s acknowledgment that the CIA destroyed hundreds of hours of videotapes documenting interrogation of two al Qaeda operatives, sparking separate investigations by the Justice Department and the House Intelligence Committee, see Mark Maz-zetti, CIA Destroyed 2 Tapes Showing Interrogations, N.Y. Times, Dec. 7, 2007, at Al; Mark Mazzetti & David Johnston, U.S. Announces Criminal Inquiry Into CIA Tapes, N.Y. Times, Jan. 3, 2008, at Al; Mark Mazzet-ti & Scott Shane, Tapes’ Destruction Hovers Over Detainee Cases, N.Y. Times, Mar. 28, 2008, at Al; President Bush's disclosure that at least fourteen al Qaeda suspects were held for years, secretly and without charges, in covert CIA "black sites” outside the United States, see Jane Mayer, The Black Sites, New Yorker, Aug. 13, 2007, at 46; Sheryl Gay Stolberg, President Moves 14 Held in Secret to Guantanamo, N.Y. Times, Sept. 7, 2006, at Al; the public admission by Secretaxy of State Condoleezza Rice that the United States mishandled the case of Canadian Maher Arar, *247 who was detained by United States officials in 2002 and deported to Syria, where Arar was allegedly held for ten months in a 3-by-6-foot cell and repeatedly beaten by Syrian interrogators, often with frayed electrical cables, see Rice Admits U.S. Erred in Deportation, N.Y. Times, Oct. 25, 2007, at A10; Ian Austen, Canada Will Pay $9.75 Million to Man Sent to Syria and Tortured, N.Y. Times, Jan. 27, 2007, at A5; and, finally, the recently declassified March 14, 2003, memorandum of the Office of Legal Counsel, advising Pentagon officials that neither federal laws prohibiting assault, maiming, and other crimes nor the U.N. Convention Against Torture nor customary international law prohibiting torture would apply to military interrogation of al Qaeda detainees overseas, because the President’s authority as Commander-in-Chief overrode such restrictions, see Dan Eggen & Josh White, Memo: Laws Didn’t Apply to Interrogators, Wash. Post, Apr. 2, 2008, at Al.